**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| | |
|---|---|
| VICKTOR STEVENSON and GLORIA ESPINOZA, individually, and on behalf of others similarly situated. | **Civ. Action No.: 14-cv-0240 (AKH)** |
| *Plaintiffs,* | **Collective Action Under 29 U.S.C. § 216(b)** |
| – against – | |
| CUTLER SOHO, LLC, CUTLER PARK AVENUE, LLC, DANIRO 57TH STREET SALON NEW YORK, LLC, RODNEY CUTLER, MICHAEL GORDON, BEN STEWART, ANTHONY BARROW, DAVID KASTIN, XYZ COMPANIES 1–10 (UNIDENTIFIED), and JOHN AND JANE DOES A–Z (UNIDENTIFIED), | **ECF Case** **Magistrate Judge James L. Cott** |
| *Defendants.* | |

---

# MEMORANDUM OF LAW IN
## SUPPORT OF PLAINTIFFS' MOTION FOR SANCTIONS

Thompson Bukher LLP
75 Broad Street, Suite 2120
New York, New York 10004
(212) 920-6050

*Attorneys for the Plaintiffs*

## Table of Contents

TABLE OF AUTHORITIES ...........................................................................................................ii

PRELIMINARY STATEMENT ....................................................................................................1

STATEMENT OF FACTS ............................................................................................................2

ARGUMENT .................................................................................................................................2

    A.    Rules 37(b) and (d): Defendants Refused to Produce Adequate Rule 30(b)(6)
    Witnesses Pursuant to the Court's Order ...................................................................9

        1.    Sanction 1: The Court should direct a factual finding regarding
        Defendants' recordkeeping. ............................................................................14

        2.    Sanction 2: Plaintiffs should be awarded costs, including attorney's fees,
        incurred in connection with the two Rule 30(b)(6) depositions they
        conducted of Defendants' inadequately prepared witnesses. .........................16

        3.    Sanction 3: Plaintiffs should be awarded costs, including attorney's fees,
        incurred in connection with this motion. ........................................................16

    B.    Rule 37(b): The Defendants Failed to Preserve and/or Destroyed Physical
    Records in the Form of Wage and Hour Records ....................................................17

        1.    Sanction 1: Plaintiffs are entitled to a mandatory presumption that the
        information contained in Defendants' employee records were
        unfavorable to the Defendants. ......................................................................24

        2.    Sanction 2: Plaintiffs should be awarded costs, including attorney's fees,
        incurred in connection with this motion. ........................................................25

    CONCLUSION AND REQUEST FOR REMEDIES ......................................................25

## **TABLE OF AUTHORITIES**

**Cases**

*Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946) ........................................................24

*Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997) ...15, 16

*Barsoum v. New York City Housing Authority*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001) ......................23

*Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 107 (2d Cir. 2001) ............. 17, 23, 24

*Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991).........................................9

*Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005) .....................................24

*Gen. Motors, LLC v. Lewis Bros., LLC*, 2013 U.S. Dist. LEXIS 91387 (W.D.N.Y. June 27, 2013) ..16

*Golia v. Leslie Fay Co.*, No. 01 Civ. 1111, 2003 WL 21878788, at *9 (S.D.N.Y. Aug. 7, 2003) 18, 23

*Hicks v. Gates Rubber Co.*, 833 F.2d 1406, 1419 (10th Cir. 1987).....................................................24

*In re Prudential Insurance Co. of America Sales Practices Litigation*, 169 F.R.D. 598, 615-17 (D.N.J. 1997) ........................................................................................................................................17

*In re September 11th Liability Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) ...............1

*Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 695 (1982).............9

*Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 152-53 (S.D.N.Y. 2007) ........15

*Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 716 (7th Cir. 1998) ..........................................24

*Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392-93 (2d Cir. 2013) ...............................................................16

*Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union*, 212 F.R.D. 178, 219-20 (S.D.N.Y. 2003) ...............................................17, 18

*Moon v. Kwon*, 248 F.Supp.2d 201, 218 (S.D.N.Y. 2002) ....................................................15, 18, 24

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976).....................................9

*National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987) 23

*Reilly v. Natwest Markets Group Inc.*, 181 F.3d 253, 269 (2d Cir. 1999) ..........................................15

*Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002) . 17, 18, 23

*Resolution Trust Corp. v. Southern Union*, 985 F.2d 196, 197 (5th Cir. 1993)...................................15

*Shiu v. New Peking Taste, Inc.*, 2013 U.S. Dist. LEXIS 185347, *10 (E.D.N.Y. 2013) ..................... 15

*Travelers Property Casualty of America ex rel. Goldman v. Pavilion Dry Cleaners*, No. Civ.A. 04-1446, 2005 WL 1366530, at *4 (D.N.J. June 7, 2005) .................................................................... 17

*Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 78-79 (S.D.N.Y. 1999) ................................... 17

*United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 26 (D.D.C. 2004) ............................. 17

*United States v. Taylor*, 166 F.R.D. 356, 363, aff'd, 166 F.R.D. 367 (M.D.N.C. 1996) ................... 15

*West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999) .......................................... 17

*Wirtz v. Miss Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966) ................................................ 15

## Statutes

29 C.F.R. §§ 516.2, 516.5, 516.28 .................................................................................................. 18, 24

29 C.F.R. 516 ..................................................................................................................................... 3

29 U.S.C. § 211(c) ................................................................................................................. 10, 15, 18

Fed. R. Civ. P. 37(b) ................................................................................................................. 9, 14, 17

Fed. R. Civ. P. 37(d)(3) .................................................................................................................... 16

N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6 ........................................................................ 18, 24

N.Y. Lab. Law § 195(4) ................................................................................................................ 10, 18

N.Y. Lab. Law § 196-a ...................................................................................................................... 25

Plaintiffs Vicktor Stevenson and Gloria Espinoza, individually and on behalf of the other joined plaintiffs in this matter (the "**Plaintiffs**"), submit this Memorandum of Law in Support of Plaintiffs' Motion for Sanctions against defendants Cutler Soho, LLC ("**Cutler Soho**"), Cutler Park Avenue, LLC ("**Cutler Park Avenue**"), Daniro 57th Street Salon New York, LLC ("**Daniro 57**"), Rodney Cutler ("**Mr. Cutler**"), Ben Stewart ("**Mr. Stewart**"), Anthony Barrow ("**Mr. Barrow**"), and David Kastin ("**Mr. Kastin**") (collectively the "**Defendants**") pursuant to Rules 37(b) and 37(d) of the Federal Rules of Civil Procedure and the inherent power of the Court.

## PRELIMINARY STATEMENT

"Discovery is run largely by attorneys, and the court and the judicial process depend upon honesty and fair dealing among attorneys." *In re September 11th Liability Ins. Coverage Cases*, 243 F.R.D. 114, 125 (S.D.N.Y. 2007) (Hon. Alvin K. Hellerstein)

This motion arises from the Defendants' and their counsel's refusal to abide by this Court's orders, the Federal Rules of Civil Procedure, federal and state law requirements for employer recordkeeping, and the well-established principles governing the preservation of evidence.

Defendants owned and operated several salons in New York City that formerly employed the Plaintiffs. The Plaintiffs brought this action because they were improperly compensated under the applicable minimum wage, overtime, and spread of hours requirements. Federal and state laws expressly require the Defendants to maintain detailed records for the sole purpose of protecting workers like the Plaintiffs and allowing such workers to accurately calculate and confirm the compensation to which their hard labor entitles them.

As detailed *infra*, not only did Defendants patently fail to maintain the legally prescribed records, they destroyed records that they are required by law to retain, and they failed to instruct their staff not to destroy such records even *after* the initiation of this lawsuit. Moreover, Defendants' counsel (i) produced a Rule 30(b)(6) witness whose knowledge of Defendants' recordkeeping and business practices was so deficient as to amount to a non-appearance; and (ii) violated the Court's discovery order to produce *all* of the Defendants' witnesses by explicitly refusing to produce an adequately

prepared replacement witness on behalf of the defendant organizations.

The Defendants' failure to produce records on whose substance the entirety of this lawsuit hinges and their refusal to produce witnesses who know anything about the creation and maintenance of such records necessitates (a) an adverse inference that Defendants failed to preserve records as prescribed by the federal and state laws as applicable to employers; (b) an adverse inference that such records were unfavorable to Defendants; and (c) an award to Plaintiffs for the costs and attorney's fees that they were forced to waste on two pointless Rule 30(b)(6) depositions as well as on the instant motion.

## STATEMENT OF FACTS

### Background

Plaintiffs, former employees of a group of related hair salons, Cutler Soho, Cutler Park Avenue, and Daniro 57, brought this collective action against Defendants, the salons, their principles, and managers, on January 13, 2014 for failure to pay minimum wages as required by the Fair Labor Standards Act ("**FLSA**") and New York Minimum Wage Act, failure to pay overtime pursuant to the FLSA and New York State Labor Law ("**NYLL**"), violation of the spread of hours wage order of the New York Commissioner of Labor, violation of timely payment provisions of the NYLL, and violation of unauthorized deduction provisions of the NYLL. (Dkt. 1.) This Court certified the collective class of Plaintiffs on May 29, 2015. (Dkt. 30.)

### Defendants Failed to Produce Detailed Hours and Wage Records for Their Employees

On October 12, 2015, Plaintiffs served upon Defendants Plaintiffs' First Set of Interrogatories and Document Requests. (Declaration of Benjamin Thompson, dated May 8, 2017 (the "**Thompson Decl.**") ¶ 4; Ex. 1 (the "**Requests**").) The Requests demanded, in relevant part, the following documents:

> 31. All documents concerning the personnel file of the Plaintiffs (including but not limited to all documents contained therein . . . 39. All documents concerning Plaintiffs' work schedule. 40. All documents reflecting the attendance of Plaintiffs. 41. All

documents concerning or reflecting the hours Plaintiffs worked, including without limitation punch cards, timesheets, time cards, and work logs. 42. All computers, laptop computers, or other electronic data storage device (or in lieu thereof, a "data mirror" of any and all relevant data contained on such electronic storage device in a readily accessible format) in which information as to Plaintiffs' work hours and/or compensation was entered and/or stored. 43. All documents concerning the method of computation and/or the amount of compensation received by Plaintiffs during employment with Defendants, including, without limitation, the following: a. all payroll records, b. copies of Plaintiffs' paychecks, c. paycheck receipts, d. records of cash payments, e. records of tips, compensation therefore, and accounting therefore, f. records of vacation, g. records of holiday, and/or sick pay, h. records of bonuses, and i. records of pay summaries.

(Ex. 1.)

Most importantly, and of greatest relevance to this matter and motion, the Requests demanded that Defendants produce "all documents or records required to be maintained by any Defendant concerning Plaintiffs by reason of their being an employee under the Fair Labor Standards Act or the New York Labor Law, or the rules and regulations issued thereunder (such as those required under 29 C.F.R. 516)." (*Id.*)

Defendants requested, and Plaintiffs granted, two extensions to submit responsive documents, first on November 10, 2015 and again on November 30, 2015, finally agreeing on a receipt deadline of December 4, 2015. (Thompson Decl. ¶ 6). Defendants not only failed to meet the extended deadline but produced responses and documents which conveyed little to no information requested by Plaintiffs and consisted primarily of meritless objections which were not based in law. (*Id*. at ¶ 7). Defendants' production evidences that Defendants failed to comply with every record keeping requirement mandated under the FLSA. To wit, Defendants' production contained:

(1) no clear or consistent records of Plaintiffs' total daily and weekly hours worked (in fact, the very few records possibly relating to Plaintiffs' time worked bore absolutely no information purporting to show their daily or weekly hours worked);

(2) no distinction between Plaintiffs' regular and overtime hours worked, nor any indication of the rates of pay for these hours;

(3) no daily earning reports, and very few weekly earning reports which are wholly inconsistent with any timesheets that were actually provided for the corresponding dates;

(4)   no consistent summaries of the total wages paid to Plaintiffs;

(5)   no indication that Plaintiffs received any premium pay for overtime hours;

(6)   no records of any amounts of tips received by Plaintiffs;

(7)   no records of the amount by which the wages of each tipped Plaintiff have been deemed increased by tips; and

(8)   no clear or consistent indication of the hours worked by Plaintiffs and the total payment received by Plaintiffs for either tipped or non-tipped work.

(Thompson Decl. ¶ 8)

Timesheets produced by Defendants, intended to serve as a record of Plaintiffs' hours worked, represented merely a fraction of those that were apparently created for each plaintiff at the time they were employed, and of those produced were wholly inadequate, barely legible, missing information critical to this matter, and contained other numerous errors. Nearly half the timesheets produced by Defendants were for dates that preceded the relevant time period in this matter. Only one third of the timesheets produced indicated the defendant salon organization from which they originated. Those timesheets which referenced a salon organization at all, indicated only that they were from "Cutler Salon," making is impossible to determine to which defendant they belonged. All timesheets included only employees' first names, making it impossible to verify whether the produced timesheets actually corresponded to any of the Plaintiffs. One time sheet has no name at all. Three-quarters of all relevant time sheets indicated that the employees referenced in the timesheet worked shifts in excess of 20 consecutive hours, often approaching or exceeding 100 consecutive hours. Nearly all timesheets contained handwritten notations with basic arithmetic formulas which did not correspond to any other information contained in the timesheet and which the Defendants could not explain or account for when asked at deposition. (Thompson Decl. ¶¶ 9-10)

On December 14, 2015, Plaintiffs served upon Defendants' counsel a notice of deficiency concerning Defendants' woefully deficient production in response to the Requests. (Thompson Decl. ¶ 11; Ex. 2.) Plaintiffs' notice of deficiency enumerated, in relevant part, the absolute dearth of properly

4

kept records in Defendants' custody, how a significant portion of the documents produced by Defendants were not legible, how the documents produced evidence that Defendants failed to track their employees' time worked in any meaningful way, and how even such records that were produced failed to indicate the dates that certain employees worked or what they were paid per hour, noting that "salaries" improperly fluctuated, "presumably based on employee attendance, indicating hourly pay at wages significantly below the statutory minimum that do not account for overtime and spread of hours as required by law." (Ex. 2.)

Defendants' counsel responded to Plaintiffs' notice of deficiency with a set of documents which Defendants claimed were "inadvertently omitted" from the initial production. (Thompson Decl. ¶ 13). The supplemental documents provided in this response consisted primarily of dozens more pages of unlabeled and illegible documents, resembling Defendants' initial production. (*Id.* ¶ 14). Defendants further stated that they believed the content and quality of their responses to be proper and compliant with the Federal Rules of Civil Procedure and Local Rules. (*Id.*). Defendants' counsel also indicated, during a phone call on or about February 4, 2016, that they had provided documentation of all records Defendants were able to locate and obtain. (*Id.*). Mr. Cutler confirmed that all documents which had been found had also been produced. (Ex. 11, Cutler Dep. at 265:14-17, April 6, 2017; Ex. 12, Cutler Dep. at 169:11-19, April 13, 2017).

The Plaintiffs provide herewith a representative sample of the deficient "wage and hour" documents produced by the Defendants. (Ex. 3.) As of the date of this motion, Defendants have yet to produce any records curing the foregoing-described deficiencies. (Thompson Decl. ¶ 16.) It has become clear, from the depositions of the Defendants which are described and quoted below, that no such records are forthcoming.

**Defendants Failed to Produce Knowledgeable Witnesses and Violated the Court's Order**

Defendants deposed Plaintiff Gloria Espinoza on February 23, 2017. (Thompson Decl. ¶ 17.) Subsequently, the parties disputed over the order in which depositions of the other parties would be

taken and whether non-forum-residing Plaintiffs could be deposed via video conference. (Thompson Decl. ¶ 18; Dkt. 46.) On March 15, 2017, the Court ordered that the parties conduct the remaining depositions in the following order: (1) Plaintiff Vicktor Stevenson; (2) any of the Defendants, as chosen by Plaintiffs' counsel; (3) the remaining Plaintiffs; and (4) the remaining Defendants. (Thompson Decl. ¶ 19; Dkt. 47 (the "**Discovery Order**").)

Acting in accordance with the Discovery Order, and at significant travel expense to the non-forum witnesses, Plaintiffs produced all of their party witnesses in-person, with Ms. Laipert deposed on April 3, 2017, Mr. Stevenson on April 4, 2017, and Ms. Coutee on April 5, 2017. (Thompson Decl. ¶ 20.)

Having honored their obligations under the Discovery Order, Plaintiffs re-noticed, pursuant to Fed. R. Civ. P. 30(b)(6), the depositions of organization defendants Cutler Soho, Cutler Park Avenue, and Daniro 57. (Thompson Decl. ¶ 21; Exs. 4 - 6 (the "**Rule 30(b)(6) Notices**").) Plaintiffs also noticed the depositions of individual defendants Mr. Cutler, Mr. Kastin, Mr. Stewart, and Mr. Barrow. (Thompson Decl. ¶ 23; Exs. 7 - 10.)

Plaintiffs' Rule 30(b)(6) Notices required the organization defendants to provide, in relevant part, a witness who was knowledgeable about the following organizational matters:

> 4. For the period of January 13, 2011 through January 13, 2014, facts and circumstances regarding the Defendant's accounting and bookkeeping, including how Employee hours were submitted, recorded, tracked, organized, and classified. 5. For the period of January 13, 2011 through January 13, 2014, facts and circumstances regarding Defendant's compensation of Employees, including, but not limited to, how wages were determined, how pay periods were determined, and how Defendant ensured compliance with the FLSA and New York State laws regulating employee hiring, classification, treatment, and compensation.

(Exs. 4 - 6.)

On April 6, 2017, Defendants produced Mr. Cutler as a Rule 30(b)(6) witness on behalf of Daniro 57. (Thompson Decl. ¶ 25; Ex. 11, Cutler Dep. at 15:16-18, Apr. 6, 2017.) On April 13, 2017, Defendants produced Mr. Cutler as a Rule 30(b)(6) witness on behalf of Cutler Park Avenue and Cutler

Soho; Mr. Cutler also represented himself as an individual party. (Thompson Decl. ¶ 27; Ex. 12, Cutler Dep. at 5:7-15, Apr. 13, 2017.) On April 19, 2017, Mr. Barrow was deposed as an individual party. On April 20, 2017, Mr. Kastin was deposed as an individual party. On April 21, 2017, Mr. Stewart was deposed as an individual party. (Thompson Decl. ¶¶ 29 - 31.)

As the Rule 30(b)(6) witness on behalf of Daniro 57, Cutler Park Avenue, and Cutler Soho, Mr. Cutler admitted that he knew virtually nothing about the defendant organizations' accounting and bookkeeping practices, including how employee hours were submitted, recorded, tracked organized, or classified. (Ex. 11, Cutler Dep. at 84:13-23, 163:11-165:7, 181:4-183:20, 189:12-191:5, 260:19-268:16, 273:13-274:23, Apr. 6, 2017; Ex. 12, Cutler Dep. at 100:4-101:5, 102:4-103:22, 104:11-106:9, 108:2-112:5, 115:10-115:24, 151:16-152:2, 162:15-167:7, Apr. 13, 2017.) Mr. Cutler admitted that he knew virtually nothing about how the defendant organizations ensured compliance with the FLSA and New York State laws regulating employee hiring, classification, treatment, compensation, and termination. (Ex. 11, Cutler Dep. at 112:12-113:18, 178:11-179:16, 181:4-183:20, 207:18-210:6, 214:17-215:16, 218:4-218:24, 224:18-25, 260:19-268:16, 273:13-274:23, Apr. 6, 2017; Ex. 12, Cutler Dep. at 16:18-23:19, 88:22-89:21, 100:4-101:5, 159:8-21, Apr. 13, 2017.) Mr. Cutler could not answer or claimed not to know why the Defendants were not able to produce detailed records (or virtually any records) of the Plaintiff's wages and hours worked, including overtime worked, tips collected, or any other information that employers are required to maintain pursuant to the FLSA and New York Labor Law and its relevant regulations. (Ex. 11, Cutler Dep. at 159:23-163:22, 167:24-171:19, 172:23-173:12, 181:4-183:20, 207:18-210:6, 214:17-215:16, 218:4-218:24, 221:16-223:19, 224:18-24, 260:19-268:16, 273:13-274:23, Apr. 6, 2017; Ex. 12, Cutler Dep. at 16:18-23:19, 88:22-89:21, 102:4-103:22, 104:11-106:9, 108:2-112:5, 115:10-115:24, 151:16-152:2, 159:8-21, 162:15-167:7, 169:6-171:18, 173:14-16, Apr. 13, 2017.) Mr. Stewart, who was also a principle of the organizational defendants, could not speak to the foregoing matters either. (Ex. 13, Stewart Dep. at 57:10-58:7, 66:12-68:11, 71:12-73:13, 74:8-75:6, 75:22-76:23, Apr. 19, 2017.) The Defendants' depositions, which are

quoted at length *infra*, make clear that the Defendants routinely destroyed records that they were required to maintain pursuant to the FLSA and New York Labor Law.

In response to Mr. Cutler's lack of knowledge as a Rule 30(b)(6) witness and overall inability to speak to organizational recordkeeping, Plaintiffs served upon Defendants a supplemental notice of deposition, pursuant to Rule 30(b)(6), requesting the production of a knowledgeable witness as to the foregoing matters. (Thompson Decl. ¶ 34; Ex. 14.) Plaintiffs' counsel also requested the production of such witnesses on the record at deposition. (Ex. 11., Cutler Dep. at 165:10-167:22, Apr. 6, 2017.) Defendants' counsel refused to produce any such responsive witness. (Thompson Decl. ¶ 36.) Indeed, in an email dated April 12, 2017, Defendants' counsel confirmed that they would not produce any knowledgeable Rule 30(b)(6) witnesses other than Mr. Cutler in response to Plaintiffs' notices and requests until Plaintiffs were re-produced for deposition[1] despite the fact that (i) Defendants had already deposed each and every individual plaintiff; (ii) Defendants had no right to re-depose witnesses without leave of the Court pursuant to Rule 30(a)(2); and (iii) the Discovery Order had ordered "all remaining Defendants" to be produced for deposition by this point. (Thompson Decl. ¶ 37; Ex. 15.)

Plaintiffs now bring this motion for sanctions because Defendants' lack of documentary production, failure to abide by the Discovery Order, and failure to produce knowledgeable organizational witnesses makes clear that (a) the Defendants have no intention in cooperating with their discovery obligations under the Federal Rules; (b) the Defendants have engaged in the systematic destruction of physical and electronic records that they were required to maintain under applicable federal and state labor laws; and (c) the Defendants refuse to produce physical and electronic records

---

[1] Mr. Kalish's letter demanded that Plaintiffs produce a "witness who can explain how the damages which appear in plaintiffs' responses to interrogatories were calculated." While not relevant to this motion, Plaintiffs note (and have explained at length to Mr. Kalish) that the individual Plaintiff witnesses had testified as to their personal knowledge of hours worked as employees for Defendants, whereas the calculation of damages based on such hours are a matter for attorneys trained in the analysis of federal and state labor laws, which calculations were, in any event, produced in response to Plaintiffs' interrogatories. If Defendants failed to ask certain questions they later deemed relevant, or did not like Plaintiffs' answers to certain questions, that does not entitle the Plaintiffs a second attempt to depose already-deposed witnesses. (Thompson Decl. FN 1.)

that they were required to maintain under applicable federal and state labor laws.

## ARGUMENT

### A.      Rules 37(b) and (d): Defendants Refused to Produce Adequate Rule 30(b)(6) Witnesses Pursuant to the Court's Order

Rule 37(b) provides district courts with the power to impose sanctions for violations of discovery orders. Fed. R. Civ. P. 37(b); *see also Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 695 (1982). The Rule states that "[i]f a part or a party's officer, director, or managing agent . . . fails to obey an order to provide or permit discovery, including an order under Rule 26(f), 35, or 37(a), the court [may order] the following: (i) directing that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims" and "[i]nstead of or in addition to the orders above, the court must order the disobedient party, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure."

District courts have broad discretion in imposing discovery sanctions. *Daval Steel Prods. v. M/V Fakredine*, 951 F.2d 1357, 1365 (2d Cir. 1991). Because discovery under the Federal Rules of Civil Procedure is designed to function free from the delay and costs of court intervention, severe sanctions are appropriate "when a party seeks to frustrate this design by disobeying discovery orders." *Id*. Such severe sanctions may include dismissal of a party's case or entry of a default judgment. *See Nat'l Hockey League v. Metro. Hockey Club, Inc*., 427 U.S. 639, 643 (1976) (*per curiam*). As the Supreme Court has held, "the most severe in the spectrum of sanctions provided by statute or rule must be available to the district court in appropriate cases, not merely to penalize . . ., but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Id*.

In this case, the parties initially disagreed on whether the plaintiff witnesses, many of whom are minimum wage workers and live outside this forum, should be forced to undergo the expense of flying to New York for depositions versus being deposed via video conference. Defendants insisted

that in-person depositions were necessary despite the fact that the vast majority of evidence relevant to the claims in this matter, specifically the hours that Plaintiffs worked and the wages they were paid, was in the Defendants' possession and control or was otherwise required to be maintained by the Defendants. *See* 29 U.S.C. § 211(c) (requiring employers to keep personnel records); N.Y. Lab. Law § 195(4) (same); *id*. § 661 (same). Defendants also insisted, for no apparent reason and without any relevant precedent in the Federal Rules, that depositions of Plaintiffs' witnesses would be conducted prior to the deposition of Defendants' witnesses. Ultimately, the Court ordered in its Discovery Decision that the Plaintiffs' witnesses would be deposed in-person, and that all witnesses would be deposed in the following order: (1) Plaintiff Vicktor Stevenson; (2) any of the Defendants, as chosen by Plaintiffs' counsel; (3) the remaining Plaintiffs; and (4) the remaining Defendants. (Dkt. 47.)

Plaintiffs honored the Discovery Decision and, at significant expense to the witnesses, produced the Plaintiffs' witnesses for in-person depositions. Defendants, on the other hand, produced a Rule 30(b)(6) organizational witness on behalf of Cutler Soho, Cutler Park Avenue, and Daniro 57 who had next to no knowledge of the requisite organizational information noticed by Plaintiffs in their Rule 30(b)(6) Notices to the Defendants. Specifically, the Rule 30(b)(6) Notices required a witness knowledgeable about the following:

> "4. For the period of January 13, 2011 through January 13, 2014, facts and circumstances regarding the Defendant's accounting and bookkeeping, including how Employee hours were submitted, recorded, tracked, organized, and classified. 5. For the period of January 13, 2011 through January 13, 2014, facts and circumstances regarding Defendant's compensation of Employees, including, but not limited to, how wages were determined, how pay periods were determined, and how Defendant ensured compliance with the FLSA and New York State laws regulating employee hiring, classification, treatment, and compensation."

(Exs. 4 - 6.)

The foregoing organizational knowledge requirements are critical to this matter where the claims all center on how much the Plaintiffs worked, how much the Plaintiffs were paid, and how the Defendants maintained such records. At his deposition, Mr. Cutler admitted that he knew nothing about

the foregoing organizational matters:

Q. What was the tracking method for attendance of the employees at Daniro?

A. I don't know.

Q. Was there any tracking?

A. I believe so.

Q. How was it done?

A. I believe Melinda did it.

Q. How did Melinda do it?

A. I don't know.

Q. Was there a software in place that managed tracking?

A. I don't think so.

(Discussion off the record.)

Q. So, I apologize for the interruption.

A. I don't know if there was policy to that specific language.

Q. If an assistant called in or requested time off for bereavement, were they granted that time off?

MR. SCHWARTZMAN: Objection to the form.

A. "Bereavement," meaning someone passed away?

Q. Yes.

A. I would absolutely insist on it if I knew the circumstances, 100 percent.

Q. And if the assistant were granted the time off for bereavement, were they paid for that time off?

A. I don't know. I don't know the situation --

Q. Was there a vacation policy?

A. Yes.

Q. What was it?

A. My understanding it was one week after one year, two weeks after two years, I think.

Q. Just to restate, you don't believe there was software in place that tracked the attendance of the employees?

A. It was done manually and it was – I think there was some software, but I don't know the dates and when -- if it was transferred over. I do remember manual, but I don't know when the dates, if that changed.

Q. So, you are saying that at some point, it did change from a manual process to an automated process or some type of software program?

A. I don't know for a fact.

Q. You don't know whether or not it changed?

A. I do know it was manual and I don't know about the software, and I don't know, if it did change the software, when it did. But I do know it was manual at one point.

Q. And when it was manual, what was that process like?

A. It wasn't my process, so I can't speak to it. I do remember seeing documentation on people, days or whatever.

Q. That documentation, what did it look like?

A. I think it was single sheets that -- single sheets of paper.

Q. And what would a single sheet say?

A. I don't know.

Q. Who would know?

A. Melinda would know that.

11

…

Q. And is that documented that they didn't come into work?
A. I don't know if it was documented every time.
MR. SCHWARTZMAN: Objection to the form.
Q. Are they paid for that day?
A. It depends on their employment situation.
Q. How does it depend on their employment situation?
A. I don't know the specifics, but it depends whether they've been with that company for -- is it their first day on the job? I do understand there's -- I don't know the specifics, but there is protocol for that.
Q. What is the protocol for that?
A. I don't know the specifics.
Q. How do you not know the specifics of that?
A. Because it wasn't my department.
MR. SCHWARTZMAN: Objection.
Q. What do you mean it wasn't your department? We already talked about that everything is your department, we went through that.
MR. SCHWARTZMAN: I'm objecting on the grounds of you getting argumentative with the witness. If you have a question to ask him, just ask –
MR. THOMPSON: I'm asking a question.
Q. We went through --
A. Melinda would know.
Q. Melinda would know what the policy was for sick leave?
A. She did the payroll, yes, whether someone is getting paid for sick leave.

…

Q. Were any of the plaintiffs paid by Cutler Park Avenue?
A. I don't know offhand.
Q. Did any of the plaintiffs ever work at Park Avenue?
A. I don't have direct evidence, I'm assuming they did based on --
Q. Do you know when?
A. No.
Q. Do you know how long or how often?
A. No.

…

Q. So, who was responsible then for enforcing attendance of employees?
A. Collectively. Ultimately, I had final say as the previous -- no one. I had final say, ultimately. But if it was a department thing, then it would be on a daily basis. So, it could have been Ben, it could have been Melinda, it could have been somebody in education who was teaching that class. It would have been probably the person they were directly involved with on that day or that period.
Q. So, these single sheets that you referred to, were they retained by the company?
A. I don't know.
Q. Were they produced to us in this litigation?

12

A. I don't believe so.

Q. Why would they not be produced?

A. I don't know. I don't know if they exist, still, so I don't know.

Q. These plaintiffs have testified and I know you have heard that, that they would be required to, "clock in and clock out." What does that refer to at Daniro?

A. I believe -- and again, it's not what I did every day, but there was responsibility to clock in and clock out when you left.

Q. And what does that mean, "to clock in and clock out"?

A. That means that you let them know when you're ready for work and when you leave your shift.

Q. And let who know?

A. The management, the front desk, wherever the clock in was.

Q. You don't know where the clock in was?

A. No, there was a different -- a couple of different systems, I think.

Q. What were those systems?

A. I don't know. At that point, we had a card. We have a card now, so I don't know whether it was manual or you let somebody know.

Q. I don't understand the response, so I'm going to ask more specifically.

A. I don't know the actual specifics on how you clock in, whether you hit a button, have a key or let somebody know. I don't know the specifics. But as I saw yesterday, there is some log-in system, a record of it.

Q. Why do you say that there's a key or a button?

A. It's like a credit card. Now, we have -- I think they punch a card in.

Q. And was that not the case in 2011?

A. I don't know. It's a different system, I don't know what that procedure was then, a credit card or a number, but there was a system.

Q. And that system -- I'm having trouble because you seem to go back and forth between it was just a manual system, what you say is just telling someone at a desk versus punching in a number on a screen?

A. Correct. I'm telling you that I don't know whether it was a manual system, punching a key or have a card, I don't know what the system was, but we did have a system in place. And I know it -- I'm certain that it has changed since then, so that's what I'm saying. I don't --

Q. So, it might have been a punch in system, in which case, what was that system, do you know –

A. I don't know.

Q. And if it was a manual system, that involved the employee telling someone when they arrive, I'm here and I'm present for work; is that correct?

A. No, because I don't know it was and I don't know what the procedure was. I understand what you are saying, but --

Q. But you have absolutely no idea of what the procedure was?

A. I have no idea.

Q. And were there consequences for failing to clock in or clock out?

A. Consequences? Did people not get paid because they didn't clock in?

Q. Any consequences.

A. I think it was strongly recommended that we need to know when you clock in and clock out so you can get paid, but no one was not paid because they didn't, to my understanding.

13

…

Q. And would they be then entered into the payroll system?
A. I don't know.
Q. Would they be entered into any other management software within the company at Daniro?
A. They come in to do the paperwork?
Q. Yes.
A. I don't know.
Q. Would they be subsequently entered into some type of management system?
A. I don't know.

(Ex. 11, Cutler Dep. 84:13-23, 159:23-161:15, 163:11-165:9, 165:10-167:22, 167:24-171:19, Apr. 6, 2017; Ex. 12, Cutler Dep. 151:16-152:2, Apr. 13, 2017.)

Following the two depositions of Mr. Cutler, wherein the Defendants insisted that Mr. Cutler's responses were made on behalf of all three organizational defendants as well himself as an individual defendant (Ex. 12, Cutler Dep. 4:6-6:3, Apr. 13, 2017), Plaintiffs served a supplemental notice of deposition pursuant to Rule 30(b)(6) demanding that Defendants produce a witness who has some actual knowledge regarding the foregoing requirements. Defendants' counsel responded that they would not produce any knowledgeable organizational witnesses other than Mr. Cutler. (Ex. 15, Email dated April 12, 2017 from Mr. Kalish.) And, indeed, Defendants have produced no such other 30(b)(6) witness in direct violation of the Court's Discovery Order that, by the conclusion of depositions, "the remaining Defendants" be produced.

**1. Sanction 1: The Court should direct a factual finding regarding Defendants' recordkeeping.**

Rule 37(b) provides that the Court may order, as a remedy, that certain "designated facts be taken as established for the purposes of the action." Fed. R. Civ. P. 37(b). The Court ordered that all Defendants be produced for deposition by the conclusion of depositions. By operation of law, the Court's order included production of any adequately prepared Rule 30(b)(6) witnesses as noticed by the Plaintiffs. The Defendants produced a witness who admitted to having no knowledge about, among many other things, how Defendants created or otherwise maintained wage and hour records that

Defendants were legally obligated to maintain under Federal and state labor laws. Indeed, such recordkeeping requirements are not mere technicalities, but substantive obligations that are "fundamental underpinnings" of FLSA and critical to ensuring the statute's effectiveness, for an employer's "[f]ailure to keep accurate records can obscure a multitude of minimum wage and overtime violations." *Moon v. Kwon*, 248 F.Supp.2d 201, 218 (S.D.N.Y. 2002) (quoting *Wirtz v. Miss Publishers Corp.*, 364 F.2d 603, 607 (5th Cir. 1966)). The Defendants have expressly refused to provide any replacement witness with knowledge of the foregoing.

"To satisfy Rule 30(b)(6), the corporate deponent has an affirmative duty to make available 'such number of persons as will' be able 'to give complete, knowledgeable and binding answers' on its behalf." *Reilly v. Natwest Markets Group Inc*., 181 F.3d 253, 269 (2d Cir. 1999). "Producing an unprepared witness is tantamount to a failure to appear." *Bank of New York v. Meridien BIAO Bank Tanzania Ltd.*, 171 F.R.D. 135, 151 (S.D.N.Y. 1997) (quoting *United States v. Taylor*, 166 F.R.D. 356, 363, aff'd, 166 F.R.D. 367 (M.D.N.C. 1996) (citing *Resolution Trust Corp. v. Southern Union*, 985 F.2d 196, 197 (5th Cir. 1993)).

The Defendants' assertive refusal to provide a witness with knowledge of their employee recording-keeping prevents, and therefore severely prejudices, Plaintiffs' ability to litigate a matter whose claims may only be proved or disproved by records that Defendants were required to maintain. It is now appropriate to impose upon Defendants the relatively lesser sanction (as compared to a default judgement or striking Defendants' pleadings) of drawing an adverse inference that Defendants have failed to maintain accurate records in violation of 29 U.S.C. § 211(c), N.Y. Lab. Law §§ 195(4) and 661. *See Shiu v. New Peking Taste, Inc*., 2013 U.S. Dist. LEXIS 185347, *10 (E.D.N.Y. 2013) (awarding an adverse inference sanction of defendant employer's failure to appear at court-ordered deposition); see also *Kyoei Fire & Marine Ins. Co. v. M/V Mar. Antalya*, 248 F.R.D. 126, 152-53 (S.D.N.Y. 2007) (holding an unprepared witness's testimony regarding the defendant's audit processes to have amounted to a "non-appearance" and, therefore, establishing for the purposes of the action that

15

no proper audits of the defendant were performed). It is further appropriate for the Court to find that, had Defendants produced an adequate Rule 30(b)(6) witness, such witness's testimony would have supported the fact that Defendants have failed to maintain accurate records in violation of 29 U.S.C. § 211(c), N.Y. Lab. Law §§ 195(4) and 661. *Id.*; *see also Gen. Motors, LLC v. Lewis Bros., LLC*, 2013 U.S. Dist. LEXIS 91387 (W.D.N.Y. June 27, 2013) (an adverse inference is a proper sanction within the scope of Rule 37(b)(2)(A)) (citing *Mali v. Fed. Ins. Co.*, 720 F.3d 387, 392-93 (2d Cir. 2013)).

### 2. Sanction 2: Plaintiffs should be awarded costs, including attorney's fees, incurred in connection with the two Rule 30(b)(6) depositions they conducted of Defendants' inadequately prepared witnesses.

Rule 37(d) is applicable when a party fails to attend its own deposition, including failure of a designated Rule 30(b)(6) representative to attend. "Producing an unprepared witness is tantamount to a failure to appear." *Bank of New York*, 171 F.R.D. at 151. Rule 37(d) provides that, in addition to the sanctions prescribed under Rule 37(b)(2)(A)(i)-(iv), the Court "must require the party failing to act, the attorney advising that party, or both to pay the reasonable expenses, including attorney's fees, caused by the failure, unless the failure was substantially justified or other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(d)(3).

As detailed *supra*, Defendants' designated Rule 30(b)(6) witness, Mr. Cutler, had no knowledge of the Defendants' employee attendance tracking, payment policies, and recordkeeping which evidence is, literally, the only evidence that Plaintiffs need to prove their case in this matter. As such, Mr. Cutler's deposition testimony was utterly useless. Accordingly, Plaintiffs should be awarded their costs, including attorney's fees, in connection with preparing and conducting the April 6 and April 13 depositions of Mr. Cutler.

### 3. Sanction 3: Plaintiffs should be awarded costs, including attorney's fees, incurred in connection with this motion.

The award of costs, including attorney's fees, that are incurred in connection with the instant motion for sanctions is "appropriate to punish the offending party for its actions or to deter [the]

litigant's conduct, sending the message that egregious conduct will not be tolerated." *Travelers Property Casualty of America ex rel. Goldman v. Pavilion Dry Cleaners*, No. Civ.A. 04-1446, 2005 WL 1366530, at *4 (D.N.J. June 7, 2005) (citing *United States v. Philip Morris USA, Inc.*, 327 F. Supp. 2d 21, 26 (D.D.C. 2004); *In re Prudential Insurance Co. of America Sales Practices Litigation*, 169 F.R.D. 598, 615-17 (D.N.J. 1997)). Furthermore, such an award serves the remedial purpose of making the opposing party whole for costs incurred as a result of the wrongful conduct. *See Turner v. Hudson Transit Lines, Inc.*, 142 F.R.D. 68, 78-79 (S.D.N.Y. 1999) ("[C]ompensable costs may arise either from the discovery necessary to identify alternative sources of information or from the investigation and litigation of the document destruction itself.").

Accordingly, where the Plaintiffs were forced to expend resources in the litigation of the instant motion, such costs are compensable.

### B.    Rule 37(b): The Defendants Failed to Preserve and/or Destroyed Physical Records in the Form of Wage and Hour Records

Spoliation is "the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." *Byrnie v. Town of Cromwell, Board of Education*, 243 F.3d 93, 107 (2d Cir. 2001) (quoting *West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 779 (2d Cir. 1999)). A court's authority to impose sanctions in response to spoliation derives from at least two sources. Where a party violates a court order—either by destroying evidence when specifically directed to preserve it or by failing to produce information when directed to do so because the relevant data have been destroyed—Rule 37(b) of the Federal Rules of Civil Procedure provides that the court may impose a range of sanctions, including dismissal or judgment by default, preclusion of evidence, imposition of an adverse inference, or assessment of attorney's fees and costs. Fed. R. Civ. P. 37(b); *see Residential Funding Corp. v. DeGeorge Financial Corp.*, 306 F.3d 99, 106-07 (2d Cir. 2002); *Metropolitan Opera Association, Inc. v. Local 100, Hotel Employees and Restaurant Employees International Union*, 212 F.R.D. 178, 219-20 (S.D.N.Y. 2003). Indeed, "**[e]ven**

**though a party may have destroyed evidence prior to issuance of the discovery order and thus may be unable to obey**, sanctions are still appropriate under Rule 37(b) because this inability was self-inflicted." *Turner*, 142 F.R.D. at 72 (emphasis added). Furthermore, "[e]ven in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs." *Residential Funding*, 306 F.3d at 106-07 (citations omitted); *see also Metropolitan Opera*, 212 F.R.D. at 220.

> A party seeking sanctions for the destruction of evidence must establish:
>
> (1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed "with a culpable state of mind"; and (3) that the destroyed evidence was "relevant" to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.

*Residential Funding*, 306 F.3d at 107; see also *Golia v. Leslie Fay Co*., No. 01 Civ. 1111, 2003 WL 21878788, at *9 (S.D.N.Y. Aug. 7, 2003). Each of those requirements is met here.

As discussed in Part A, *supra*, Defendants had a strict legal obligation to create, maintain, and preserve records of Plaintiffs' wages and hours worked under 29 U.S.C. § 211(c) and N.Y. Lab. Law § 195(4) and § 661. Defendants' obligations to preserve such records stemmed not only from the traditional requirements imposed by pending or foreseeable litigation, but from the "fundamental underpinnings" of the FLSA. *Moon*, 248 F.Supp.2d at 218. Specifically, Defendants were required to maintain and preserve, for each Plaintiff, (1) the total daily and weekly hours worked; (2) the regular hourly rates of pay for each week in which overtime compensation is due; (3) the total daily and weekly earnings; (4) the total wages paid; (5) the total weekly premium pay for overtime hours; (6) the weekly or monthly amounts of tips received by employees; (7) the amount by which the wages of each tipped employee have been deemed increased by tips; and (8) the hours worked and total payment for both tipped and non-tipped work. *See* 29 C.F.R. §§ 516.2, 516.5, 516.28. New York law imposes similar obligations on employers. *See* N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6.

Defendants have failed to produce any employee records containing the foregoing-described

items in response to Plaintiffs' Requests. Defendants failed to produce such records even after they

were served with a notice of deficiency noting the absolute dearth of employee records and delineating

the deficiencies of the few records that were produced which records (i) failed to track employee time

worked in any meaningful way; and (ii) failed to indicate the dates that certain employees worked or

what they were paid per hour.

Defendants failed to produce such responsive records despite admitting at deposition that the

Defendants had a policy of retaining such records:

> Q. You don't know whether there was a policy in place to retain documents?
> A. There was a policy, yes.
> Q. What was the policy?
> A. The management was to have from their application, to their starting date, to -- I
> do think attendance, I think that was part of it. And if there was any written dialog in-
> between on anything that would be important.
> Q. Okay. So, an employee's application at Daniro, their start date, their attendance
> record and any written communication with that employee of anything important, the
> policy was that it would be retained?
> A. My understanding, yes, we would have -- my understanding is that those records
> were kept.
> Q. So, it's different -- I think a different response that it's your understanding that
> they were kept versus was there a policy?
> A. No, there is a policy. My understanding is that it should have been kept. Whether
> it is or isn't, I don't know.
> Q. Are you saying that the policy was keep the records?
> A. Yes.

(Ex. 13, Cutler Dep. at 207:18-210:6, Apr. 6, 2017.)

Additionally, Mr. Stewart, a principal of the defendant organizations, admitted that employee

records, "over the years," were stored in physical paper form:

> Q. Were there any safeguards for retention that you know of? For instance, like a
> redundant server or storage policy of documents or anything like that?
> MR. SCHWARTZMAN: Objection to form.
> A. I mean, I remember – I don't know if it was during this time period because I can't
> really remember, but we did have file cabinets in the basement of Soho where we
> stored documents over the years for employee documents, people had folders. And
> then I know we saved cash receipts and credit card things. We had to save that for
> taxes. I know in Soho there were plastic tubs that those were saved in. They were
> stacked on top of each other in the basement. That's the only thing about documents
> that I know.

(Ex. 13, Stewart Dep. at 71:12-73:13, Apr. 21, 2017.)

Mr. Cutler, the Defendants' Rule 30(b)(6) witness, noted that employee records, specifically

dealing with daily attendance, were kept in paper form in each employee's file:

> Q. Was there ever any written communication about attendance?
> A. I think there was, but I can't be sure. I think there was.
> Q. You think there was written communication about this?
> A. I think there was an attendance – I mentioned that last week, I think there was a
> sheet that had everyone's attendance and vacation days, et cetera.
> Q. You think?
> A. I think.
> Q. Do you know that?
> A. I remember seeing a document in everyone's file.
> Q. Were those documents produced in this matter?
> A. I don't know.
> Q. If they were not produced, was there a reason they were not produced?
> A. There's no reason, no. No one was telling them not to.
> Q. Were those documents retained?
> A. That I don't know.

(Ex. 12, Cutler Dep. 88:22-89:21, Apr. 13, 2017). Mr. Cutler further admitted that employee records

were stored in paper form because they were printed out when Defendants discontinued the use of

certain software:

> Q. Again, who was then in charge of that period of time? 2010 to 2012, who was in
> charge of the retention of documents?
> A. We didn't have -- I didn't have a policy.
> Q. But someone was keeping them, some of them?
> A. I don't know whether this was already printed out or -- I don't know. I'm
> assuming this was printed odd because the software doesn't exist any more, so I'm
> assume this was printed out at some point, and I don't know.

(Ex. 12, Cutler Dep. at 108:2-112:5, Apr. 13, 2017.)

Despite the foregoing admissions that Defendants created and maintained paper records in

connection with their employees, the Defendants have produced only sparse records which failed to

contain virtually any of the information required to be maintained by employers under the FLSA and

New York law. (Ex. 17.) Indeed, on the one hand Defendants' Rule 30(b)(6) witness claimed that

employee records were maintained, but on the other hand admitted that such records were not produced

in response to Plaintiffs' document requests:

Q. So, earlier, we talked about these policies and that there seems to really not be one. In this case, how would anyone know how many times Ms. Coutee was either absence or late for work?

MR. SCHWARTZMAN: Objection to the form of the question.

A. How would Ben know? He was pretty in-tune with what -- that was his department.

Q. What was his department?

A. The color department.

Q. But how would he know that -- I mean, 26 is a specific number, do you agree with that?

A. Yes.

Q. And how would he know that there were 26 times in a period of 12 months that she was either late or –

A. You would have to ask him, I don't know.

Q. So, I would either -- I mean, is it safe to assume that there's a record that would indicate that?

MR. SCHWARTZMAN: Objection to the form of the question.

A. A record? Does he have a record of it? I would assume he did because he came up with a very specific number. Whether that's written or in his head, I don't know.

Q. Is it a practice of Ben Stewart to keep in his head the number of times that employees are absent or tardy for work?

MR. SCHWARTZMAN: Objection to the form of the question. It speaks -- another individual.

A. I don't know his capabilities --

Q. Have you ever observed Ben Stewart retain the number of tardiness or absence of an employee in his head without writing it down?

MR. SCHWARTZMAN: Objection to the form of the question. Again, it goes to the state of mind of another individual.

MR. THOMPSON: These are not rules of evidence.

Q. So, is it your understanding that this statement, "Did not come to work on 26 different occasions," is based on document record?

MR. SCHWARTZMAN: Objection to the form.

A. I don't know. I don't have that information in front of me.

Q. If it was documented, was it produced in this litigation?

A. I don't know.

Q. If it was not produced, is there a reason that it was not produced?

A. I wasn't there, so I can't speak to it.

(Ex. 11, Cutler Dep. 181:4-183:20, Apr. 6, 2017.) To the extent that records were produced, such records were so deficient with respect to the federal and state requirements for employer recordkeeping that even Defendants' Rule 30(b)(6) witness could not explain the substance of what was produced:

Q. If I'm looking at the first page, 208, it says the word "Vicktor," and then it has in parentheses what appears to be the abbreviation for assistant, do you agree with that?

A. Yes.

Q. Do we know who this relates to?

A. Yes.

Q. How do we know? Who does it relate to?

A. I don't know.

Q. So, we don't know who this relates to?

A. No, I don't know who it relates to. I have an idea, but I don't want to make an assumption about who it is. Vicktor.

Q. I mean, it clearly relates to Vicktor, but do we know who Vicktor is, is my question.

A. Do I know who Vicktor is?

Q. Yes.

A. Who worked with us in 2011?

Q. Yes.

A. Who's a plaintiff?

Q. I don't know that. I'm asking you, is this the same Vicktor?

A. I don't know, but I'm assuming that.

Q. Well, why was this document produced then if we don't know who it is? Is it just a random person?

A. I didn't produce it. I didn't look for it. I'm making an assumption that it's Vicktor Stevenson because we didn't have any other assistants and he's a plaintiff in this case, I'm assuming it's Vicktor.

Q. So, there were no other Vicktors employed at Daniro?

A. Not that I can recall.

Q. And there is a handwritten notation under the word "Vicktor" that says three days, do you see that?

A. Yes.

Q. What does that refer to?

A. I don't know. I don't know whether it's three days he worked or three days he clocked in, I don't know. I don't know his schedule that week.

(Ex. 11, Cutler Dep. 191:6-207:9, April 6, 2017.)

Where Defendants claim to have maintained employee records but failed to produce such records, the Court can and should assume that such records were destroyed. Indeed, Defendants' Rule 30(b)(6) witness admitted that, even after the initiation of this lawsuit, Defendants' employees were not instructed to preserve records:

Q. And when you were made aware or when Daniro was made aware of this lawsuit, did it instruct its employees not to dispose of any records?

A. Did I instruct them to?

Q. Did the company instruct its employees --

A. Absolutely not. Absolutely not.

MR. SCHWARTZMAN: Listen to his question.

Q. Did Daniro, anyone at the company instruct its employees to not destroy records?

A. No.

Q. It did not actively say, "Do not destroy your records"?

A. Oh, did they destroy?

Q. Yes. What I'm asking is, was there an assertive instruction to retain, not destroy any records?

MR. SCHWARTZMAN: Objection as to form.

> A. So, you're talking about staff or you're talking about the people who would be looking for this stuff?
>
> Q. I'm talking about employees or members of Daniro.
>
> A. Employees were not instructed not to destroy their records because I didn't have this conversation with many people about what was going on. And the people that it pertained to, all I told them to do what you need, what you're authorized to do, and that was once we got instruction, it was -- they went to work and finding stuff. Mainly Derek -- mainly Melinda, but with Derek's -- he had a better understanding of what was needed. So, were they told not to? They weren't told not to destroy stuff.
>
> Q. There was no instruction to retain records once you've learned of this lawsuit?
>
> A. "Retain," meaning from the previous years? I did not have specific instruction where I said you need to retain it, that was blatantly obvious, you know -- I certainly didn't tell anyone to destroy anything. It was whatever we had, we had and we didn't touch anything until we were told. I didn't know the process, I've never been through this before, and then Derek and Melinda -- Melinda went to work on it with Derek's help.

(Ex. 11, Cutler Dep. 221:16-223:19, Apr. 6, 2017.) Defendants had an obligation to preserve employee records, not only under the express statutes of the FLSA and New York Labor Law, but also, and especially so, after the initiation of this lawsuit. Indeed, Defendants had the obligation to inform their employees of the requirements of preservation:

> It is no defense to suggest . . . that particular employees were not on notice. To hold otherwise would permit an agency, corporate officer, or legal department to shield itself from discovery obligations by keeping its employees ignorant. The obligation to retain discoverable materials is an affirmative one; it requires that the agency or corporate officers having notice of discovery obligations communicate those obligations to employees in possession of discoverable materials.

*National Association of Radiation Survivors v. Turnage*, 115 F.R.D. 543, 557-58 (N.D. Cal. 1987) (footnote omitted). The Defendants' conduct in failing to preserve and, likely, destroying records that would prove all of the Plaintiff's claims in this matter demonstrates a sufficiently culpable state of mind to warrant sanctions. "[S]pecific intent to thwart the litigation process is not necessary." *Golia*, 2003 WL 21878788, at *9 (citing *Byrnie*, 243 F.3d at 109). In fact, a showing of gross negligence is plainly enough to justify sanctions at least as serious as an adverse inference. *See Residential Funding*, 306 F.3d at 108; *Golia*, 2003 WL 21878788, at *9-11; *Barsoum v. New York City Housing Authority*, 202 F.R.D. 396, 400 (S.D.N.Y. 2001).

Even if the Court does not find that the foregoing facts support a reasonable inference that Defendants destroyed employee records with the intent to thwart this litigation, or even through sheer gross negligence, the Second Circuit nevertheless has held that destruction of evidence in violation of a regulation that requires its retention can give rise to an inference of spoliation. *See Byrnie*, 243 F.3d at 108-109 (agreeing with other Circuit Courts that have held the same); *accord Latimore v. Citibank Fed. Sav. Bank*, 151 F.3d 712, 716 (7th Cir. 1998) ("The violation of a record[-]retention regulation creates a presumption that the missing record contained evidence adverse to the violator."); *Favors v. Fisher*, 13 F.3d 1235, 1239 (8th Cir. 1994) (because employer violated record retention regulation, plaintiff "was entitled to the benefit of a presumption that the destroyed documents would have bolstered her case"); *Hicks v. Gates Rubber Co*., 833 F.2d 1406, 1419 (10th Cir. 1987) (same).

Pursuant to 29 C.F.R. §§ 516.2, 516.5, 516.28 and N.Y. Comp. Codes R. & Regs. tit. 12, § 142-2.6 the Defendants were required to keep detailed records of employee wages and hours. The Defendants have admitted to creating and maintaining such records in physical form, yet the Defendants have either refused or been unable to produce such records. An inference of spoliation is, therefore, warranted.

### 1.  Sanction 1: Plaintiffs are entitled to a mandatory presumption that the information contained in Defendants' employee records were unfavorable to the Defendants.

The Supreme Court has held that when a defendant fails to comply with the recordkeeping requirements of the FLSA, a plaintiff employee may carry his burden "if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Moon*, 248 F. Supp. 2d at 219, quoting *Anderson v. Mt. Clemens Pottery Co*., 328 U.S. 680, 687 (1946). "[I]t is possible for plaintiff to meet this burden by relying on his recollection alone." *Doo Nam Yang v. ACBL Corp.*, 427 F. Supp. 2d 327, 335 (S.D.N.Y. 2005). New York law similarly provides that where an employer fails "to keep adequate records, . . . the employer in violation shall bear the burden of proving

that the complaining employee was paid wages, benefits and wage supplements." N.Y. Lab. Law § 196-a.

Accordingly, if Defendants cannot or otherwise refuse to produce employee records setting forth the facts relevant to Plaintiffs' wage and hour claims, then Plaintiffs are entitled to a mandatory presumption that the information contained in such records was unfavorable to the Defendants.

### 2. Sanction 2: Plaintiffs should be awarded costs, including attorney's fees, incurred in connection with this motion.

For the same reasons set forth in Part A, supra, Plaintiffs should be awarded costs and attorney's fees that they have incurred in connection with this motion.

### <u>CONCLUSION AND REQUEST FOR REMEDIES</u>

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiffs motion for sanctions and order the following remedies:

1.    **With respect to Fed. R. Civ. P. 37(b) and (d)**, for Defendants' refusal to produce adequately prepared Rule 30(b)(6) witness pursuant to the Court's order, that sanctions be awarded in the form of the Court (i) directing a finding that Defendants failed to maintain adequate wage and hour records, or otherwise destroyed such records, with the intent to deprive Plaintiffs of such records in this litigation; (ii) ordering Defendants to pay Plaintiffs' reasonable expenses, including attorney's fees, in connection with the two Rule 30(b)(6) depositions conducted by the Plaintiffs; and (iii) ordering Defendants to pay Plaintiffs' reasonable expenses, including attorney's fees, in connection with this motion.

2.    **With respect to Fed. R. Civ. P. 37(b)**, for Defendants' failure to preserve physical records in the form of wage and hour records, and/or for their destruction of such information, that sanctions be awarded in the form of the Court (i) ordering a mandatory presumption (including instructions to the finder of fact requiring such mandatory presumption) that the information contained in such records was unfavorable to the Defendants; and (ii) ordering Defendants and their attorneys, mutually and severally, to pay Plaintiffs' reasonable expenses, including attorney's fees, in connection with this motion.

3.    **With respect to the Court's inherent powers**, to order such additional sanctions and/or relief against Defendants as the Court deems equitable and just.

Dated:  New York, New York
        May 8, 2017

THOMPSON BUKHER LLP

By: _____
    Tim Bukher (TB1984)
    Benjamin S. Thompson (BT2176)
    Michael Feldberg (MF0220)
75 Broad Street, Suite 2120
New York, New York 10004
Telephone: (212) 920-6050
Facsimile: (646) 349-2366

*Attorneys for the Plaintiff*