Stevenson v. Cutler, et al - 14-cv-0240 (AKH)
Plaintiffs' Motion for Sanctions

# Exhibit 11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------

VICKTOR STEVENSON and GLORIA ESPINOZA,
individually, and on behalf of others similarly
situated,

                         Plaintiffs,

         -v-        Civil Action No. 14-cv-0240 (AKH)

CUTLER SOHO, LLC, CUTLER PARK AVENUE, LLC, DANIRO
57TH STREET SALON NEW YORK, LLC, RODNEY CUTLER,
MICHAEL GORDON, BEN STEWART, ANTHONY BARROW, DAVID
KASTIN, XYZ COMPANIES 1-10 (UNIDENTIFIED), and JOHN
AND JANE DOES A-Z (UNIDENTIFIED),

                         Defendants.

--------------------------------------------


            DEPOSITION OF RODNEY CUTLER, a
Defendant herein, taken by the Plaintiffs, at the
offices of THOMPSON BUKHER LLP, 75 Broad Street,
New York, New York 10004, on Thursday, April 6,
2017, at 10:00 a.m., before Jeffrey Shapiro, a
Shorthand Reporter and notary public, within and
for the State of New York.

2

1       A P P E A R A N C E S :

2       THOMPSON BUKHER LLP
        Attorneys for the Plaintiffs
3       75 Broad Street, Suite 2120
        New York, New York 10004
4       646-770-1097

5           BY:  BENJAMIN S. THOMPSON, ESQ.
                 TIM BUKHER, ESQ.
6                MICHAEL FELDBERG, ESQ.

7

8

        MOSS & KALISH, PLLC
9       Attorneys for the Defendants
        122 East 42nd Street
10      New York, New York 10168
        212-867-4488
11
            BY:  JAMES SCHWARTZMAN, ESQ.
12

13

14                          ***

15

16

17

18

19

20

21

22

23

24

25

15

Cutler

1
2       Q.     For who?
3              MR. SCHWARTZMAN:  I'm going to object
4          to the question.
5              MR. THOMPSON:  Fine.
6              MR. SCHWARTZMAN:  You can ask him --
7          I'm going to object to the question and
8          direct him not to answer.  You're asking
9          him to make a legal conclusion that he is
10         not qualified to make.
11             MR. THOMPSON:  Mike, will you please
12         go get Albert Hellerstein's chambers phone
13         number for me.
14             (Discussion off the record.)
15     BY MR. THOMPSON:
16         Q.     Are you here as a representative of
17     Daniro?
18         A.     Yes.
19         Q.     And again, I'm going to ask you to
20     look at page 3 of the deposition notice and
21     confirm that you are familiar with all of these
22     items, which is required.
23             MR. SCHWARTZMAN:  Objection to the
24          form of the question.
25     BY MR. THOMPSON:

84

1                            Cutler

2           Q.    Who else would have made them?

3           A.    Ben might have made some phone calls.

4           Q.    And so, then the new hire, assuming

5     they accept the position, would come in, would

6     speak to Melinda about what all again?  So, they

7     are given an employee handbook?

8           A.    To speak about the duties at hand and

9     the education opportunities, we -- a lot of people

10    want to work with us because of the education.

11    So, we would walk through what that looks like,

12    the opportunities and classes that we provide.

13          Q.    And would they be then entered into

14    the payroll system?

15          A.    I don't know.

16          Q.    Would they be entered into any other

17    management software within the company at Daniro?

18          A.    They come in to do the paperwork?

19          Q.    Yes.

20          A.    I don't know.

21          Q.    Would they be subsequently entered

22    into some type of management system?

23          A.    I don't know.

24          Q.    During 2011, was there any software

25    at Daniro that managed the hiring process?

112

Cutler

1    not --

2

3         A.    So, Derek had been there by then, it

4    would have be a discussion between Melinda, Derek,

5    and I would ultimately have that decision.

6         Q.    The ultimate decision is yours to

7    terminate a stylist and/or a colorist?

8         A.    Yes.  I don't think we terminated any

9    stylists.

10        Q.    What about colorists?

11        A.    I don't think we did.

12        Q.    And then what about assistants, who

13   would make the decision regarding termination of

14   assistants?

15        A.    There's a group discussion based on

16   where they were.  Ben would obviously, he would

17   convey the information and I would ultimately

18   decide.  I don't remember.  Again, I -- specific,

19   I don't remember firing anyone in that time, but

20   I'd have to look at the records.

21        Q.    And when you say "records," what do

22   you mean?

23        A.    You're talking about a very specific

24   timeline, so did we hire, fire someone in December

25   2010 or was it January 5th -- I don't want to try

113

Cutler

1    and be specific that I know that we hired --

2        Q.    I appreciate that.  But when you say

3    that I'd have to check the records, what do you

4    mean that you have to check?

5        A.    Obviously, we didn't have records,

6    but I'd have to have something to show me that

7    there was people fired, and then I could decide.

8        Q.    And what would you refer to, to check

9    that?

10       A.    I don't have any records to check

11   that.

12       Q.    And when you say "I'd have to check

13   the records," you're just trying to --

14       A.    I'm just trying to explain --

15       Q.    You don't know --

16             (Talking over each other.)

17       A.    Exactly.

18       Q.    And so, whether or not, let's say

19   2010 through 2012 just so that we cover a period

20   of time in which there's a greater sample base, so

21   that you're not concerned about the specifics.  If

22   I need something that is specific, a date, I will

23   let you know.

24       A.    Sure.

159

Cutler

1

2       Q.    So, what does a person say when they

3    call in and they want to take a day off --

4       A.    How do I know what they --

5              MR. SCHWARTZMAN:  Objection to the

6          question.

7    BY MR. THOMPSON:

8       Q.    What do you instruct an employee to

9    do if they want to take a day off --

10      A.    They call in and say I'm not coming

11   to work today because I'm sick.

12      Q.    And then what happens?

13             MR. SCHWARTZMAN:  Objection to the

14         form.

15             THE WITNESS:  They don't come to

16         work.

17   BY MR. THOMPSON:

18      Q.    And what are the consequences of not

19    coming to work?

20             MR. SCHWARTZMAN:  Objection to the

21         form.

22   BY MR. THOMPSON:

23      Q.    And is that documented that they

24    didn't come into work?

25      A.    I don't know if it was documented

160

Cutler

1    every time.

2                    MR. SCHWARTZMAN:   Objection to the

3         form.

4    BY MR. THOMPSON:

5         Q.    Are they paid for that day?

6         A.    It depends on their employment

7    situation.

8         Q.    How does it depend on their

9    employment situation?

10        A.    I don't know the specifics, but it

11   depends whether they've been with that company

12   for -- is it their first day on the job?  I do

13   understand there's -- I don't know the specifics,

14   but there is protocol for that.

15        Q.    What is the protocol for that?

16        A.    I don't know the specifics.

17        Q.    How do you not know the specifics of

18   that?

19                    THE WITNESS:  Because it wasn't my

20        department.

21                    MR. SCHWARTZMAN:   Objection.

22   BY MR. THOMPSON:

23        Q.    What do you mean it wasn't your

24   department?  We already talked about that

161

Cutler

1          everything is your department, we went through

3          that.

4                          MR. SCHWARTZMAN:  I'm objecting on

5                  the grounds of you getting argumentative

6                  with the witness.  If you have a question

7                  to ask him, just ask --

8                          MR. THOMPSON:  I'm asking a question.

9          BY MR. THOMPSON:

10                 Q.    We went through --

11                 A.    Melinda would know.

12                 Q.    Melinda would know what the policy

13         was for sick leave?

14                 A.    She did the payroll, yes, whether

15         someone is getting paid for sick leave.

16                 Q.    Is an assistant always paid for a day

17         that they are not there due to being sick?

18                 A.    As I just said to you, I would have

19         to look at the policy that Melinda -- that we put

20         into place, so I just answered that.

21                 Q.    If a person, an assistant wanted to

22         take time off for bereavement, was there a policy

23         in place for that?

24                         MR. SCHWARTZMAN:  Objection as to

25                  form.

163

1                            Cutler

2           it was three weeks after five years and four weeks

3           after ten years, I think.

4                    Q.    And is that paid vacation?

5                    A.    Which department?

6                    Q.    Assistants.

7                    A.    Yes.

8                    Q.    If they didn't take that vacation,

9           were they paid additionally?

10                   A.    I don't know the policy on that.

11                   Q.    What was the tracking method for

12          attendance of the employees at Daniro?

13                   A.    I don't know.

14                   Q.    Was there any tracking?

15                   A.    I believe so.

16                   Q.    How was it done?

17                   A.    I believe Melinda did it.

18                   Q.    How did Melinda do it?

19                   A.    I don't know.

20                   Q.    Was there a software in place that

21          managed tracking?

22                   A.    I don't think so.

23                         (Discussion off the record.)

24          BY MR. THOMPSON:

25                   Q.    So, I apologize for the interruption.

164

Cutler

1          Just to restate, you don't believe there was

2     software in place that tracked the attendance of

3     the employees?

4

5              A.    It was done manually and it was -- I

6     think there was some software, but I don't know

7     the dates and when -- if it was transferred over.

8     I do remember manual, but I don't know when the

9     dates, if that changed.

10             Q.    So, you are saying that at some

11    point, it did change from a manual process to an

12    automated process or some type of software

13    program?

14             A.    I don't know for a fact.

15             Q.    You don't know whether or not it

16    changed?

17             A.    I do know it was manual and I don't

18    know about the software, and I don't know, if it

19    did change the software, when it did.  But I do

20    know it was manual at one point.

21             Q.    And when it was manual, what was that

22    process like?

23             A.    It wasn't my process, so I can't

24    speak to it.  I do remember seeing documentation

25    on people, days or whatever.

165

Cutler

1

2      Q.    That documentation, what did it look

3      like?

4      A.    I think it was single sheets that --

5      single sheets of paper.

6      Q.    And what would a single sheet say?

7      A.    I don't know.

8      Q.    Who would know?

9      A.    Melinda would know that.

10     Q.    So, Mr. Cutler, I'm going to ask you

11     to look again at Exhibit 1, which is this notice.

12                    (Indicating.)

13     And on page 3, Section 4, "By the time

14     period we request that the person that is

15     provided, produced on behalf of Daniro, which is

16     who we're deposing today, is familiar with the

17     facts and circumstances regarding defendant's

18     accounting and bookkeeping, including how employee

19     hours were submitted, recorded, tracked, organized

20     and classified."

21     So, for a large part of these questions you

22     have answered that you don't know, and that

23     Melinda, who is, I believe, Melinda Cuevas is the

24     person who does know; is that correct?

25                    MR. SCHWARTZMAN:  Is there a

166

                            Cutler

1

2              question?  The testimony speaks for

3              itself.  I don't think --

4                   (Talking over each other.)

5                   THE WITNESS:  I don't know if she

6              knows, but that was what she did.  I

7              didn't do that, so it would be reckless

8              for me to even attempt to tell you what

9              those documents look like.  That was

10             her -- I believe her role at that time.

11             Whether she knows that information, has

12             that information, I don't know.  Anything

13             I do know, I can't be specific on.

14     BY MR. THOMPSON:

15             Q.   But just so that you know, this, this

16      deposition notice asked for specific things, and

17      then the company is required to produce an

18      individual that is knowledgeable of those things.

19      So, that if you don't know what those things are,

20      then we then have the right to request production

21      of another individual that does know the answer to

22      those things, and that's what we will do.

23                   MR. SCHWARTZMAN:  You are making a

24             statement.  This isn't a question.  So,

25             you can make statements you want, but I

167

Cutler

1
2      just want to be clear, there's no question

3      pending to the witness.

4              MR. BUKHER:  We're stating that we're

5      requesting another 30(b)(6) witness --

6              MR. SCHWARTZMAN:  Well, that's a

7      request you make to me.  That's not a

8      request you make --

9              MR. BUKHER:  Right.  And that's a

10     request we're making to you on the record.

11             MR. SCHWARTZMAN:  And I'm taking it

12     under advisement.

13             MR. THOMPSON:  And as well, we were

14     just advising the witness that we have

15     requested production and you failed to

16     produce the witness that can answer these

17     questions.

18             MR. SCHWARTZMAN:  Well, we can deal

19     with the legal ramifications of the notice

20     and this witness's testimony --

21             MR. THOMPSON:  Yeah, I know that, I'm

22     just stating it.

23   BY MR. THOMPSON:

24        Q.    So, who was responsible then for

25   enforcing attendance of employees?

168

Cutler

1

2          A.    Collectively.  Ultimately, I had

3     final say as the previous -- no one.  I had final

4     say, ultimately.  But if it was a department

5     thing, then it would be on a daily basis.  So, it

6     could have been Ben, it could have been Melinda,

7     it could have been somebody in education who was

8     teaching that class.  It would have been probably

9     the person they were directly involved with on

10    that day or that period.

11         Q.    So, these single sheets that you

12    referred to, were they retained by the company?

13         A.    I don't know.

14         Q.    Were they produced to us in this

15    litigation?

16         A.    I don't believe so.

17         Q.    Why would they not be produced?

18         A.    I don't know.  I don't know if they

19    exist, still, so I don't know.

20         Q.    These plaintiffs have testified and I

21    know you have heard that, that they would be

22    required to, "clock in and clock out."

23         What does that refer to at Daniro?

24         A.    I believe -- and again, it's not what

25    I did every day, but there was responsibility to

169

Cutler

1    clock in and clock out when you left.

2           Q.    And what does that mean, "to clock in
3    and clock out"?

4           A.    That means that you let them know
5    when you're ready for work and when you leave your
6    shift.

7           Q.    And let who know?

8           A.    The management, the front desk,
9    wherever the clock in was.

10          Q.    You don't know where the clock in
11   was?

12          A.    No, there was a different -- a couple
13   of different systems, I think.

14          Q.    What were those systems?

15          A.    I don't know.  At that point, we had
16   a card.  We have a card now, so I don't know
17   whether it was manual or you let somebody know.

18          Q.    I don't understand the response, so
19   I'm going to ask more specifically.

20          A.    I don't know the actual specifics on
21   how you clock in, whether you hit a button, have a
22   key or let somebody know.  I don't know the
23   specifics.  But as I saw yesterday, there is some
24   log-in system, a record of it.

170

Cutler

1

2      Q.    Why do you say that there's a key or

3      a button?

4      A.    It's like a credit card.  Now, we

5      have -- I think they punch a card in.

6      Q.    And was that not the case in 2011?

7      A.    I don't know.  It's a different

8      system, I don't know what that procedure was then,

9      a credit card or a number, but there was a system.

10     Q.    And that system -- I'm having trouble

11     because you seem to go back and forth between it

12     was just a manual system, what you say is just

13     telling someone at a desk versus punching in a

14     number on a screen?

15     A.    Correct.  I'm telling you that I

16     don't know whether it was a manual system,

17     punching a key or have a card, I don't know what

18     the system was, but we did have a system in place.

19     And I know it -- I'm certain that it has changed

20     since then, so that's what I'm saying.  I don't --

21     Q.    So, it might have been a punch in

22     system, in which case, what was that system, do

23     you know --

24     A.    I don't know.

25     Q.    And if it was a manual system, that

171

Cutler

1    involved the employee telling someone when they

2    arrive, I'm here and I'm present for work; is that

3    correct?

4          A.    No, because I don't know it was and I

5    don't know what the procedure was.  I understand

6    what you are saying, but --

7          Q.    But you have absolutely no idea of

8    what the procedure was?

9          A.    I have no idea.

10          Q.    And were there consequences for

11    failing to clock in or clock out?

12          A.    Consequences?  Did people not get

13    paid because they didn't clock in?

14          Q.    Any consequences.

15          A.    I think it was strongly recommended

16    that we need to know when you clock in and clock

17    out so you can get paid, but no one was not paid

18    because they didn't, to my understanding.

19          Q.    So, testimony of the plaintiffs that

20    you witnessed where they say if they didn't clock

21    in, they were not paid is false testimony?

22                MR. SCHWARTZMAN:  Objection to the

23              form.

24                THE WITNESS:  When you say "false" --

172

1                          Cutler

2        BY MR. THOMPSON:

3                 Q.    What you said contradicts testimony

4          that has been given by the plaintiffs --

5                     MR. SCHWARTZMAN:  Objection to the

6                 form.  You're categorizing the testimony.

7                     Just let him rephrase the question.

8                 I'm objecting --

9        BY MR. THOMPSON:

10                Q.    You can answer the question.

11                    MR. SCHWARTZMAN:  Can you read back

12                the question, please?

13                    (Readback of prior question.)

14                    THE WITNESS:  I'm certain nobody

15                didn't get paid because they didn't clock

16                in.  Did Melinda speak to them and say you

17                need to clock in or here are the

18                consequences?  I don't know, I didn't

19                instruct her to do it.

20        BY MR. THOMPSON:

21                Q.    So, possibly?

22                A.    Yes.

23                Q.    And you said that no one would not be

24          paid because they failed to clock in?

25                A.    No.

173

Cutler

1

2          Q.    If they failed to clock in, how would

3     you then cure their failure so that they were

4     paid?

5          A.    Because we pay people on a daily

6     basis.

7          Q.    What does that mean?

8          A.    We pay people per day, on the

9     assumption that they would work eight hours of

10    work.  And so, we know who was at work, I know for

11    a fact Melinda would not be like you didn't clock

12    in or I didn't see you on that day.

13         Q.    When they were there?

14         A.    Absolutely.

15         Q.    And so, what you are saying then is

16    that it was more of a binary system, you're there

17    or you're not, and that the clock in and clock out

18    was more arbitrary in terms of time?

19              MR. SCHWARTZMAN:  Objection to the

20         form of the question.

21              THE WITNESS:  No, I think -- she

22         needed that information, but at the end of

23         the day, she was -- they were creating a

24         shift based on in best efforts for it to

25         be 40 hours a week.  And, you know,

178

Cutler

1          protest that's submitted to a government agency.

2                  Was there documentation that --

3                          MR. SCHWARTZMAN:  Just for the

4                     record, there's nothing on here that

5                     indicates to whom that it was addressed to

6                     a government agency, just on the face of

7                     the document, unless you can identify for

8                     me where it does, just for the record.

9          BY MR. THOMPSON:

10                 Q.    So, was there a meeting between Ben

11         Stewart and Ms. Coutee on November 15th, 2011 to

12         address her tardiness?

13                 A.    All I can get by is what I read here.

14                 Q.    And based on that, what is the

15         answer?

16                 A.    I wasn't there.

17                 Q.    So, that means there was a meeting or

18         there wasn't a meeting?

19                 A.    It means that I wasn't there and I

20         didn't see it, so I can't speak to it.

21                 Q.    So, you don't know, is that the

22         answer?

23                 A.    All I can go by is this.

24                 Q.    But would you just answer the

179

Cutler

1
2        question, was there a meeting or not?

3                A.    I don't know --

4                Q.    And during that meeting, there is

5        evidence here that suggest that there was

6        documentation.

7                Do you know if that documentation exists?

8                A.    I don't know.

9                Q.    If that documentation exists, was it

10       produced in this litigation?

11               A.    Litigation?

12               Q.    Yeah.  In our litigation today --

13               A.    I don't know.

14               Q.    -- was this documentation that's

15       referred to produced to us?

16               A.    I don't know.

17               Q.    If it was not produced, is there a

18       reason why it was not produced?

19               A.    I don't know.  I don't know if it --

20                     MR. THOMPSON:  So, I call for

21                 production of the documentation relating

22                 to a warning of termination for Ms. Coutee

23                 from Mr. Stewart, November 15th, 2011.

24                     MR. SCHWARTZMAN:  Taken under

25                 advisement.

181

1                          Cutler

2          specific.

3      BY MR. THOMPSON:

4          Q.    So, earlier, we talked about these

5      policies and that there seem to really not be one.

6          In this case, how would anyone know how many

7      times Ms. Coutee was either absence or late for

8      work?

9                      MR. SCHWARTZMAN:   Objection to the

10             form of the question.

11                     THE WITNESS:   How would Ben know?   He

12             was pretty in-tune with what -- that was

13              his department.

14     BY MR. THOMPSON:

15         Q.    What was his department?

16         A.    The color department.

17         Q.    But how would he know that -- I mean,

18     26 is a specific number, do you agree with that?

19         A.    Yes.

20         Q.    And how would he know that there were

21     26 times in a period of 12 months that she was

22     either late or --

23         A.    You would have to ask him, I don't

24     know.

25         Q.    So, I would either -- I mean, is it

182

                              Cutler

 1
 2        safe to assume that there's a record that would
 3        indicate that?
 4                    MR. SCHWARTZMAN:  Objection to the
 5              form of the question.
 6                    THE WITNESS:  A record?  Does he have
 7              a record of it?  I would assume he did
 8              because he came up with a very specific
 9              number.  Whether that's written or in his
10              head, I don't know.
11        BY MR. THOMPSON:
12              Q.    Is it a practice of Ben Stewart to
13        keep in his head the number of times that
14        employees are absent or tardy for work?
15                    MR. SCHWARTZMAN:  Objection to the
16              form of the question.  It speaks --
17              another individual.
18                    THE WITNESS:  I don't know his
19              capabilities --
20        BY MR. THOMPSON:
21              Q.    Have you ever observed Ben Stewart
22        retain the number of tardiness or absence of an
23        employee in his head without writing it down?
24                    MR. SCHWARTZMAN:  Objection to the
25              form of the question.  Again, it goes to

183

Cutler

1              the state of mind of another individual.
2                     MR. THOMPSON:  These are not rules of
3         evidence.
4      BY MR. THOMPSON:
5              Q.   So, is it your understanding that
6         this statement, "Did not come to work on 26
7         different occasions," is based on document record?
8                     MR. SCHWARTZMAN:  Objection to the
9              form.
10                    THE WITNESS:  I don't know.  I don't
11             have that information in front of me.
12     BY MR. THOMPSON:
13             Q.   If it was documented, was it produced
14        in this litigation?
15             A.   I don't know.
16             Q.   If it was not produced, is there a
17        reason that it was not produced?
18             A.   I wasn't there, so I can't speak to
19        it.
20                    MR. THOMPSON:  So, we call for
21             production of records that demonstrate
22             that Amber Coutee was either late or
23             absent between November 2010 and November
24             2011, 26 times.

189

Cutler

1
2          THE WITNESS:  I would assume not.
3      There is different circumstances.
4          MR. THOMPSON:  And I have one more
5      exhibit in this category, and then we can
6      take a break after that.
7          MR. SCHWARTZMAN:  That's fine.
8          MR. THOMPSON:  Daniro 4, please.
9          (Exhibit 4 was so marked for
10     identification.)
11  BY MR. THOMPSON:
12     Q.    Mr. Cutler, have you taken a minute
13  to look through these?
14     A.    Yes, I haven't looked closely,
15  though.
16     Q.    But what are these generally, do you
17  know?
18     A.    They look like they're log-in sheets.
19     Q.    And they're log-in sheets that are
20  printouts from what?
21     A.    From assistants, work log in days --
22  their days.
23     Q.    It appears to be from a software
24  application; correct?
25     A.    Yes.

190

Cutler

1

2 Q. And do know what that is?

3 A. This is Shortcuts.

4 Q. And earlier, we talked about

5 Shortcuts as being a scheduling system that the

6 receptionist managed, you said?

7 A. Yes, it books appointments.

8 Q. And so, does it also then keep track

9 of time of the employees?

10 A. I don't know for a fact, but it

11 clearly states the hours that people worked in the

12 software, on the sheets, yes.

13 Q. So, then it's your assumption that

14 Shortcuts may have been the automated software

15 system that managed the clock in and clock out of

16 the employees during 2011?

17 A. Yes.

18 Q. Have you ever seen these documents

19 before?

20 A. No.

21 Q. You did not personally produce these

22 to your attorneys to be produced --

23 A. I did not personally do it.

24 Q. Who did, do you know?

25 A. I would assume that Melinda looked

191

Cutler

1

2    for them in the files or wherever she stored them.

3    Whether she always had them printed out or whether

4    she had to.  I don't know.  I don't know where

5    they get them.

6        Q.   If I'm looking at the first page,

7    208, it says the word "Vicktor," and then it has

8    in parentheses what appears to be the abbreviation

9    for assistant, do you agree with that?

10        A.   Yes.

11        Q.   Do we know who this relates to?

12        A.   Yes.

13        Q.   How do we know?  Who does it relate

14    to?

15        A.   I don't know.

16        Q.   So, we don't know who this relates

17    to?

18        A.   No, I don't know who it relates to.

19    I have an idea, but I don't want to make an

20    assumption about who it is.  Vicktor.

21        Q.   I mean, it clearly relates to

22    Vicktor, but do we know who Vicktor is, is my

23    question.

24        A.   Do I know who Vicktor is?

25        Q.   Yes.

192

1                          Cutler

2              A.    Who worked with us in 2011?

3              Q.    Yes.

4              A.    Who's a plaintiff?

5              Q.    I don't know that.  I'm asking you,

6        is this the same Vicktor?

7              A.    I don't know, but I'm assuming that.

8              Q.    Well, why was this document produced

9        then if we don't know who it is?  Is it just a

10       random person?

11             A.    I didn't produce it.  I didn't look

12       for it.  I'm making an assumption that it's

13       Vicktor Stevenson because we didn't have any other

14       assistants and he's a plaintiff in this case, I'm

15       assuming it's Vicktor.

16             Q.    So, there were no other Vicktors

17       employed at Daniro?

18             A.    Not that I can recall.

19             Q.    And there is a handwritten notation

20       under the word "Vicktor" that says three days, do

21       you see that?

22             A.    Yes.

23             Q.    What does that refer to?

24             A.    I don't know.  I don't know whether

25       it's three days he worked or three days he clocked

193

Cutler

1

2        in, I don't know.  I don't know his schedule that

3        week.

4              Q.    In the lined items there, do you see

5        that there are -- assuming that you can make the

6        same sense that I can out of the information

7        that's presented, and it says, "On Wednesday,

8        6/22/2011," there appears to be a log on at 2:06

9        p.m.?

10             A.    Yes.

11             Q.    And then a log off on 6/23/2011, at

12       9:12 a.m.?

13             A.    Right.

14             Q.    For a total of 19 hours and six

15       minutes?

16             A.    Right.

17             Q.    Is it likely that Vicktor logged in

18       and appeared for work at 2:06, on 6/22, and then

19       left work at 9/12 a.m. the next morning?

20             A.    No.

21             Q.    The next line has a strike through

22       through it, it is a similar time frame of 22 hours

23       and 59 minutes.  Let's move to Friday, on

24       6/4/2011, there's a log in at 8:11 a.m., and then

25       a log out at 8:46 p.m., totalling 12 hours and 35

194

1                        Cutler

2       minutes.

3              Does that look like a more realistic time

4       frame of work for you?

5                    MR. SCHWARTZMAN:  Objection to the

6                 form.

7                    THE WITNESS:  We don't take clients

8                 at 8:00 in the morning.

9       BY MR. THOMPSON:

10             Q.    So, is there any reason that Vicktor

11      would be at work at 8:11 a.m. --

12             A.    The only reason he would be there at

13      8:00, that would be for an education class.

14             Q.    And are you paid as an assistant, are

15      you paid to attend education classes?

16             A.    Yes.

17             Q.    So, then there is a clock in at 8:11

18      a.m. and a clock out at 8:46 p.m., is that --

19             A.    Well, I don't know that because the

20      first one says 2:06 and 9:12, so if it's the next

21      day at 9:12, you would assume it's a log in again

22      and not a log out.  So, I --

23             Q.    Well, let's look at the previous one

24      that has a strike through.  If you look at the log

25      out at 6/24/2011, at 8:11 a.m.  And then

195

1                            Cutler

2          immediately, there's a log in the next day -- the

3          same day on the next line, do you see that?

4               A.    I understand where you're going with

5          it, yes.

6               Q.    So, does that indicate that there is

7          a credible log on at 8:11 a.m.?

8               A.    Just as much as it indicates a

9          credible log in at 2:06, on Wednesday.

10              Q.    Please just answer the question.

11              A.    That's my answer.

12              Q.    Does 2:06 indicate a credible log in?

13              A.    I'm not sure.

14                    MR. SCHWARTZMAN:  Can you be specific

15               which one we're talking about?

16                    MR. THOMPSON:  The first line, the

17               same line referred to by the witness.

18         BY MR. THOMPSON:

19              Q.    So, I'm going to move to the next

20         page, which is 40.  On Tuesday, July 5th, 2011,

21         there is a log on at 8:17 a.m.

22              Do you see that?

23              A.    Yes.

24              Q.    And then there's a log off the next

25         day at 7:59 a.m.

196

Cutler

1

2          Do you see that?

3              A.    Yes.

4              Q.    Is it possible that, again, here

5      where Vicktor, assistant would work 23 hours and

6      42 minutes in a shift?

7              A.    I think the challenge I'm seeing is

8      that there's no log out that's realistic the day

9      before.  So, I would assume that we didn't have

10     education at 8:17 in the morning.  He's chosen to

11     log in at 8:00, this is correct, it doesn't say

12     when he logged out realistically, he didn't log

13     out at 7:59.  My assumption is that he forgot to

14     log out.  I don't know whether he left at 2:00 in

15     the afternoon or 8:00 at night.  And he logged out

16     the next morning when he was about to log in.

17     He's logged out to log in the next morning.

18             Q.    I agree with that because then on the

19     next line, we see the same thing that we saw in

20     the first document --

21             A.    What it doesn't tell me is when he

22     left work there.  I do know that we don't take

23     clients at 8:00 a.m., that has never happened.

24     And we did have an education at 8:00.  Whether he

25     logged in early than the class, I'm assuming that

197

Cutler

1   he was there for class, why he would log in before

2

3   class, I don't know.

4          Q.    But there again we see at 7:59 a.m.

5   log out, and then logged back in; correct?  And

6   then we see, again, what you stated is a failure

7   to log out, which I agree that there's some

8   evident problem, whether it's user-oriented or

9   software-oriented, I don't think we know the

10  answer looking at this.  But then we see a log out

11  at 8:56 a.m. two days later on 7/8/2011; is that

12  correct?  I mean, it's unlikely and it's

13  unreasonable that there was a 48-hour and

14  57-minute shift.

15         Is that correct?

16         A.    He's obviously logged out in the

17  morning, and then logged back in.  It doesn't tell

18  us when he left work that day.

19         Q.    I agree.  But what it does tell us is

20  that on three separate instances in this one week,

21  that he was there at 8:17 a.m., at 7:59 a.m. or at

22  8:56 a.m.

23         Do you agree with that?

24         A.    Was he there at that time?  The log

25  speaks to that.

198

Cutler

1          Q.    So, we agree that a bare-minimum of

2     what we could take away from this is that Vicktor,

3     whomever he was, was present at Daniro and was on

4     the Shortcut system at these times, at 8:17 a.m.,

5     7:59 a.m. and 8:56 a.m.?

6          A.    If that's correct.

7          Q.    I'm going to turn the page.  This is

8     also a Shortcuts report; is that correct?

9               MR. SCHWARTZMAN:  Can you just

10                identify which page you're talking about?

11               MR. THOMPSON:  It's Bates stamped as

12                116 and this is a production by

13                defendants.

14               THE WITNESS:  It doesn't have the --

15                I can't tell for sure.

16     BY MR. THOMPSON:

17          Q.    Does it appear to be a Shortcuts

18     report?

19          A.    It has the same structure to it, yes.

20          Q.    And there is a name in the top left

21     corner that says "Gloria."

22          Do you see that?

23          A.    Yes.

24          Q.    Do we know who Gloria is?

199

                              Cutler

1

2          A.    Yes.

3          Q.    And who is Gloria?

4          A.    She's a plaintiff.

5          Q.    And how do we know that this is

6    Gloria Espinoza?

7          A.    I don't know for a fact.  I'm only

8    looking at the name and the dates and --

9          Q.    And were there other Glorias employed

10   at Cutler, to your recollection?

11         A.    I don't recall.

12         Q.    And then there's handwritten notes

13   there.  It says, "Five plus one equals six," and

14   there's a circle around some portion of that, do

15   you see that?

16         A.    Yes.

17         Q.    Do you know what that means?

18         A.    I don't know.

19         Q.    If we look closely at the dates that

20   are 2/16, 2/17 and 2/18, and then if you follow

21   the log in and log out times, and then the total

22   hours worked, does that appear to reflect an

23   accurate day's work for this employee?

24              MR. SCHWARTZMAN:  Objection to the

25         form.

200

1                        Cutler

2                 THE WITNESS:  Day's work on an

3            average or --

4       BY MR. THOMPSON:

5            Q.    Does this look like a credible log in

6       and log out time?

7                      MR. SCHWARTZMAN:  Are we talking

8                 about all the entities collectively?

9                      MR. THOMPSON:  Just the three --

10                     THE WITNESS:  You're saying could she

11                have logged in and logged out at these

12                times?

13      BY MR. THOMPSON:

14           Q.    I'm saying does that represent what

15      an ordinary day might look like?

16           A.    No.

17           Q.    Why not?

18           A.    Because we didn't have ordinary days,

19      they weren't all the same.  Does this reflect a

20      possible scenario?  Yes.  She clocked in before

21      her work at 8:45, and this could be a possible

22      scenario.  It's not an ordinary day of work.

23           Q.    But it is a possible scenario, and by

24      "ordinary," you mean that there was no ordinary,

25      is that what you stated?

201

Cutler

1

2          A.     Based on the old discussions --

3          Q.     Are there names associated with

4     these?

5          A.     I think this is so hard to read, I

6     don't feel comfortable guessing who are these.

7     There's an IA, there's a Y, I implying it's

8     Gloria, I don't.  I mean --

9          Q.     Is it indicated anywhere on the

10    document that it's Gloria Espinoza?

11         A.     Not clearly, not in my opinion.

12         Q.     I'm turning to document 121.

13    Similarly, there's a name that says "Sally."

14         Do we know who that refers to?

15         A.     I'm assuming it's a plaintiff.

16         Q.     And how do we assume that?

17         A.     Because for obvious reasons.

18         Q.     What are those obvious reasons?

19         A.     If she's an assistant, Sally, I'm

20    assuming that Melinda has looked through the files

21    for her particular log in, that's what I assume.

22         Q.     Were there other Sallys employed at

23    Daniro?

24         A.     I don't recall.

25         Q.     And you see that there is a

202

Cutler

1          handwritten marking, "Three plus two equals five"?

2                    A.    Yes.

3                    Q.    Do we know what that means?

4                    A.    I do not know.  I don't know who

5          wrote that or when it was written.

6                    Q.    I'm going to skip one page because

7          it's redundant.  I'm looking at 126 at the bottom

8          right.  I believe it's in your hand.  Again, it's

9          a similar report.

10                   Do you agree that this appears to be a

11         Shortcuts report, as well?

12                   A.    Yes.

13                   Q.    And this refers to an Amber,

14         assistant, do we know who that is?

15                   A.    Yes.

16                   Q.    Who is what?

17                   A.    I'm assuming it's Amber Coutee.

18                   Q.    Why are we assuming that?

19                   A.    Because Melinda looked through her

20         file, I don't see the last name, but I'm assuming

21         it's that.

22                   Q.    And were there other Ambers employed

23         at Daniro?

24                   A.    I don't recall.

203

Cutler

1

2          Q.    There is also a handwritten "4/1

3     equals five" with a circle around it.

4          Do you know what that means?

5          A.    I have no idea.

6          Q.    Do you know who wrote that?

7          A.    No.

8          Q.    And then the final page, if we turn

9     one more, it's 138.

10         A.    These records, these are logged in

11    correctly; right?

12         Q.    I'm sorry?

13         A.    These are logged in correctly, the

14    before and afters.

15         Q.    I'm looking at the final page now,

16    and again, this is a Shortcuts report; is that

17    correct?

18         A.    Yes.

19         Q.    And it says that it relates to Amber,

20    again, there's no last name; is that correct?

21         A.    Like I said before, I assume it's

22    Amber and I don't know if there was any other

23    Ambers working at the time.

24         Q.    And then it says, "4/1 plus one

25    equals five."

204

Cutler

1       Any idea what that means?

2              A.    I have no idea.

3              Q.    Do you know who wrote that?

4              A.    I have no idea, or when it was

5       written.

6              Q.    Do you still use Shortcuts?

7              A.    No.

8              Q.    And does this appear to be the

9       timekeeping system that was in place during 2011?

10             A.    No, we have a different software.

11                   (Recess taken.)

12      BY MR. THOMPSON:

13             Q.    So, Mr. Cutler, just to wrap up where

14      we were, we were looking at these time sheets that

15      I believe you stated are all Shortcuts reports,

16      most of which you have, which you're not familiar

17      with, if I'm correct, and that --

18             A.    I'm familiar with it, but I'm not

19      responsible.  I didn't create the document, I'm

20      familiar with it, but --

21             Q.    You're familiar with it, but just to

22      make sure we're on the same page, what do you mean

23      that you're familiar with it?

24             A.    I can identify that it's Shortcuts,

205

                        Cutler
1       the log in and --
2               Q.    Right.
3               A.    -- the information.  I didn't put it
4       in there.
5               Q.    But we're speculative as to who they
6       represent; is that correct?  We're making
7       assumptions as to who the people that day reflect
8       time --
9                       MR. SCHWARTZMAN:  Objection to the
10                form.
11      BY MR. THOMPSON:
12              Q.    And also there are handwritten
13      notations on there that were not made by you?
14              A.    Correct.
15              Q.    And you don't know who made those
16      notations?
17              A.    No.
18              Q.    This software system is no longer in
19      use at Daniro?
20              A.    Correct.
21              Q.    And do you have access to these
22      reports, still?
23                      MR. SCHWARTZMAN:  Objection to the
24                form of the question.

206

1                              Cutler

2                  THE WITNESS:  We obviously have some

3            access, but I don't know how much --

4            BY MR. THOMPSON:

5        Q.    And was this printed out in response

6    to a request for production?

7        A.    I don't know.

8        Q.    And was it stored in a box or a file

9    in a drawer?

10       A.    I don't know, but I can find out.

11       Q.    And any idea why the numbers

12   throughout them are so erratic, why the hours of

13   time worked are sometimes in excess of 24 or even

14   48 hours?

15                  MR. SCHWARTZMAN:  Note my objection

16           to the form of the question.

17                  THE WITNESS:  I mean, I think you

18           know that, that they didn't clock -- they

19           didn't log out on the days.

20   BY MR. THOMPSON:

21       Q.    And where are the rest of these

22   documents?

23       A.    That, I don't know.

24       Q.    And you personally had not made any

25   search for the documents -- have you made any

207

Cutler

1                        Cutler
2     search for these documents?
3              A.    No.
4              Q.    Did you make any search for any other
5     documents similar to this?
6              A.    I didn't because I'm not the one who
7     stored them if they were stored, or would know
8     where to retrieve them if they needed to be
9     retrieved.
10             Q.    I'm going to move on from this
11    exhibit and we're going to talk about document
12    retention of Daniro.
13          Is there a policy for document retention?
14                  MR. SCHWARTZMAN:  Note my objection
15            to the form of the question.
16                  THE WITNESS:  No.
17    BY MR. THOMPSON:
18             Q.    Was there a policy between 2010 and
19    2012 that related to the retention of records for
20    Daniro?
21                  MR. SCHWARTZMAN:  Note my objection
22            to the form.
23                  THE WITNESS:  What documents?
24          Pertaining to what?
25    BY MR. THOMPSON:

208

1                              Cutler
2              Q.    Pertaining to employment records.
3              A.    Yes.  I would assume that, yes, it
4      was our intent to have records, yes.
5              Q.    The intent was to have records?
6              A.    Yes.
7              Q.    Was there a policy of document
8      retention?
9              A.    Yes.
10             Q.    And what was that policy?
11             A.    Specifically what documents?
12             Q.    Employment records.
13             A.    When people started?
14             Q.    General records that were -- any
15     record that related to an employee.
16                  MR. SCHWARTZMAN:  Objection to the
17                form of the question.
18                  THE WITNESS:  Yes, I would -- there
19                should have been.
20     BY MR. THOMPSON:
21             Q.    Was there?
22             A.    That, I don't know.
23             Q.    You don't know whether there was a
24     policy in place to retain documents?
25             A.    There was a policy, yes.

209

1                             Cutler

2          Q.    What was the policy?

3          A.    The management was to have from their

4     application, to their starting date, to -- I do

5     think attendance, I think that was part of it.

6     And if there was any written dialog in-between on

7     anything that would be important.

8          Q.    Okay.  So, an employee's application

9     at Daniro, their start date, their attendance

10    record and any written communication with that

11    employee of anything important, the policy was

12    that it would be retained?

13         A.    My understanding, yes, we would

14    have -- my understanding is that those records

15    were kept.

16         Q.    So, it's different -- I think a

17    different response that it's your understanding

18    that they were kept versus was there a policy?

19         A.    No, there is a policy.  My

20    understanding is that it should have been kept.

21    Whether it is or isn't, I don't know.

22         Q.    Are you saying that the policy was

23    keep the records?

24         A.    Yes.

25         Q.    Where is that policy written?

210

Cutler

1

2          A.     There is no policy.

3          Q.     There's no policy?

4          A.     It's a verbal policy.

5          Q.     It's a verbal policy, keep records?

6          A.     Yes.

7          Q.     And who instructed that policy?  If

8     it was a verbal policy, it means someone told it

9     to the rest of the team.

10         Who was the person that spoke that policy?

11         A.     Well, Melinda, who did the HR, and

12    Derek, who came on the GM, and myself and Ben, we

13    all --

14         Q.     You, Melinda and Derek Reynolds, you

15    would instruct the employees and management at

16    Daniro to retain all employee records that related

17    to their application, start date, attendance

18    record and any written communication, otherwise?

19         A.     With the employees, no.  I'm speaking

20    to us retaining information, having those records.

21    Melinda, somebody applies for a job, they fill out

22    a form, they get a start date, they have their I-9

23    form, their Social Security, those things should

24    be on record, they should have been on record.

25    Now, whether they were, 100 percent I can't speak

214

Cutler

1

2          Q.    But you don't have a separate storage

3     location?

4          A.    No.

5          Q.    Except for your house in -- okay.

6     And then when you say that those are bins that are

7     holding folders, I presume; is that correct?

8     What's in the bins, specifically?

9          A.    Most of what I see is the accountant

10    taking the bank records and just storing it for

11    tax purposes, in case there is an audit or

12    whatever.  Beyond that, I don't know what else is

13    in there and I don't know whether this came from a

14    bin or retrieved from Shortcuts, I don't know

15    that.  And I don't know where those personal

16    employee records are.

17         Q.    So, there's not been a policy or

18    protocol that relates to the retention of the

19    employee records for a long-term period of time?

20         A.    Not a written policy, but -- no.

21         Q.    But there is an understanding, you're

22    saying, to keep an employee's file for a period of

23    time?

24              MR. SCHWARTZMAN:  Objection as to

25         form.

215

Cutler

 1              THE WITNESS:  There wasn't a clear,

 2          definitive policy, but my understanding is

 3          they were kept for logical reasons.

 4   BY MR. THOMPSON:

 5          Q.   And when you say that they were kept,

 6   how long are they kept?

 7          A.   I don't know.  I don't know if

 8   somebody moved on or terminated.  I don't know

 9   whether they were destroyed or -- we didn't

10   have -- I didn't have a policy with Melinda or

11   Derek needing to keep them, but bank you need to

12   keep for seven years, that's pretty universally

13   known.  So, I didn't have a policy that had to

14   keep them, so I never -- I know I never addressed

15   that.  If it exists or not, I don't know.

16          Q.   Who is in charge of keeping records?

17          A.   Well, Melinda does most of the HR,

18   and Derek would have helped guide her with some of

19   those decisions.

20          Q.   Is Melinda still employed by Daniro

21   or with any entity?

22          A.   Yes, Soho.

23          Q.   And what about Derek?

24          A.   Derek is -- he's employed by Soho and

218

Cutler

1       retrieval system that is --

2                   A.    No.

3                   Q.    What is the policy for disposal or

4       destruction of records, do you have one?

5                   A.    We don't have one.

6                   Q.    Do you have a shredder at the office?

7                   A.    The bookkeeper has a shredder.

8                   Q.    And are documents regularly shredded?

9                   A.    No.

10                  Q.    Are documents regularly disposed of?

11                  A.    No.

12                  Q.    Is there any other reason that you

13      can testify to as to why there are sparse records

14      about attendance or time tracking of employees?

15                      MR. SCHWARTZMAN:  Objection to the

16                  form of the question, to the extent it

17                  categorizes.

18                      THE WITNESS:  There is no -- we had

19                  it, we sent it out.  There's no reason

20                  why -- I don't know what came out as

21                  Shortcuts and I don't know what was kept,

22                  but there is no reason -- in my opinion,

23                  no, I don't know --

24                      MR. THOMPSON:  I'm going to introduce

221

                         Cutler

1

2              MR. THOMPSON:  Thank you.

3              MR. SCHWARTZMAN:  You're making a

4         statement.

5              MR. THOMPSON:  Thank you.

6              MR. SCHWARTZMAN:  Well, I'm asking

7         you, do you have a question for the

8         witness?

9              MR. THOMPSON:  Yeah, I have plenty of

10         questions, and they're forthcoming.

11    BY MR. THOMPSON:

12         Q.   So, subsequent to January 31st, 2014,

13    were there any records that relate to this that

14    were disposed of or destroyed?

15         A.   Absolutely not.

16         Q.   And when you were made aware or when

17    Daniro was made aware of this lawsuit, did it

18    instruct its employees not to dispose of any

19    records?

20         A.   Did I instruct them to?

21         Q.   Did the company instruct its

22    employees --

23         A.   Absolutely not.  Absolutely not.

24              MR. SCHWARTZMAN:  Listen to his

25         question.

222

Cutler

1   BY MR. THOMPSON:

2         Q.   Did Daniro, anyone at the company

3   instruct its employees to not destroy records?

4         A.   No.

5         Q.   It did not actively say, "Do not

6   destroy your records"?

7         A.   Oh, did they destroy?

8         Q.   Yes.  What I'm asking is, was there

9   an assertive instruction to retain, not destroy

10  any records?

11                MR. SCHWARTZMAN:  Objection as to

12            form.

13                THE WITNESS:  So, you're talking

14            about staff or you're talking about the

15            people who would be looking for this

16            stuff?

17  BY MR. THOMPSON:

18        Q.   I'm talking about employees or

19  members of Daniro.

20        A.   Employees were not instructed not to

21  destroy their records because I didn't have this

22  conversation with many people about what was doing

23  on.  And the people that it pertained to, all I

24  told them to do what you need, what you're

223

Cutler

1

2     authorized to do, and that was once we got

3     instruction, it was -- they went to work and

4     finding stuff.  Mainly Derek -- mainly Melinda,

5     but with Derek's -- he had a better understanding

6     of what was needed.  So, were they told not to?

7     They weren't told not to destroy stuff.

8          Q.    There was no instruction to retain

9     records once you've learned of this lawsuit?

10          A.    "Retain," meaning from the previous

11    years?  I did not have specific instruction where

12    I said you need to retain it, that was blatantly

13    obvious, you know -- I certainly didn't tell

14    anyone to destroy anything.  It was whatever we

15    had, we had and we didn't touch anything until we

16    were told.  I didn't know the process, I've never

17    been through this before, and then Derek and

18    Melinda -- Melinda went to work on it with Derek's

19    help.

20          Q.    So, it's clear from the records that

21    you have produced that they were poorly maintained

22    as they relate to tracking of attendance, tracking

23    of hours worked by employees?

24               MR. SCHWARTZMAN:  Objection to the

25          form of the question, to the extent it

224

1                              Cutler

2              categorizes prior testimony --

3       BY MR. THOMPSON:

4              Q.    So, I'm asking that because if you're

5       then all of a sudden aware that there's a lawsuit

6       that relates to these issues, and you might have

7       an understanding that there is a poor document

8       retention structure in place that you might assert

9       that we need to change that right this minute --

10                   MR. SCHWARTZMAN:  Objection as to

11                   form on the same grounds.

12                   THE WITNESS:  I take this so

13                   seriously, and this has been extremely

14                   painful, the whole experience.  And I

15                   would never do anything wrong to make it

16                   more complicated.

17      BY MR. THOMPSON:

18             Q.    Are you familiar with the strict

19      requirements of employers to keep records of time

20      for their employees?

21                   MR. SCHWARTZMAN:  Objection to the

22                   form of the question.  There's an

23                   assumption made in the --

24                   THE WITNESS:  I'm not familiar.

25      BY MR. THOMPSON:

260

Cutler

1
2      car, if I was running somewhere at -- first of
3      all, I was never there at 9:00.  My last clients
4      were 6:00, 5:45 -- 5:30 and 6:00.
5           Q.    And then would you ask an assistant
6      to go retrieve your car?
7           A.    If there's times that I did, it would
8      be around that time.
9           Q.    And then how long would that person
10     wait in your car while you were wrapping up?
11          A.    Two to ten minutes at most.
12          Q.    Never more than an hour?
13          A.    No.  First of all, you can't park
14     your car -- if I parked my car on 57th Street for
15     an hour, I'm getting a ticket.
16          Q.    Did you ever get tickets due to that?
17          A.    I never got a ticket.  You cannot
18     park your car on 57th Street --
19          Q.    So, what was the most amount of time
20     that an assistant would be allowed to work in a
21     given day?
22                MR. SCHWARTZMAN:  Objection to form.
23                THE WITNESS:  I would say the days
24            where they had education, and if that was
25            an unusually long day, that could have

261

1                          Cutler

2            been a day where it was 11 hours.

3     BY MR. THOMPSON:

4            Q.    And then how many days a week would

5     an assistant be allowed to work?

6            A.    Those hours?

7                  MR. SCHWARTZMAN:  Objection as to

8             form.

9     BY MR. THOMPSON:

10           Q.    Any hours.

11           A.    What do you mean, "any hours"?

12           Q.    Any hours, how many days a week would

13    an assistant be scheduled if --

14           A.    Our best effort was to put people to

15    work 40 hours.  Take into consideration the lunch,

16    paid lunches, and which they didn't work in their

17    time.  They took lunch, got paid.  And did it go

18    over at certain times, one or two hours, possibly,

19    yes.  But our goal -- our objective is to have

20    people work 40 hours.

21           Q.    So, were there assistants who would

22    work six days a week?

23           A.    If that happened, it was rare, and it

24    wasn't part of our system.  It would be a unique

25    situation and no one, I know for a fact, has ever

262

Cutler

1
2  been forced to do that.  If we were short somebody
3  and they wanted to pick up another day or could
4  you pick up another day, nobody was ever forced to
5  work six days a week and --
6          Q.    But would they work six days a week?
7  Would assistants work --
8          A.    Very rarely.  I think it's fair to
9  say it probably happened, that it did happen, but
10 it was not part of our -- it wasn't in our
11 structure to do that.
12         Q.    Would assistants work more than 40
13 hours a week?
14         A.    I think there were times when they
15 did.
16         Q.    Would they work more than 50 hours a
17 week?
18         A.    Absolutely not.
19         Q.    Never an assistant worked more than
20 50 hours a week?
21         A.    No.
22         Q.    How do you know that?
23         A.    I just -- I know that.
24         Q.    But how?
25         A.    I know the way we had our systems.

263

Cutler

1      Q.     What systems, that there is no

2   documentation of this?

3              MR. SCHWARTZMAN:  Objection as to

4        form.

5   BY MR. THOMPSON:

6      Q.     So, what systems were ensuring that?

7      A.     The way we structured the business.

8   First of all, they had to be in the premises for

9   55 hours a week.

10     Q.     I don't understand --

11     A.     And they had lunch, as well, for an

12  hour every day, or we assume that they didn't take

13  lunch.

14     Q.     I just don't understand the response,

15  I'm sorry.

16          What does it mean that they would have to be

17  on the premises 55 hours a week?

18     A.     They had five hours of lunch every

19  week.

20     Q.     I just don't understand how that's

21  responsive.

22     A.     Right.  So, they did not work 50

23  hours and have five hours lunch and were in their

24  location for 55 hours, it did not happen.

264

Cutler

1

2          Q.    You're saying there was never -- in

3    response to did they ever work more than 50 hours

4    a week, you are saying no, it did not happen

5    because they would have five hours of lunch and it

6    would be 55 hours, is that what you mean?

7          A.    I'm not saying it didn't happen

8    because of that.  I'm saying that didn't happen,

9    and that is the scenario.

10          Q.    And I'm asking -- you're saying that

11    it didn't happen because we had systems in place,

12    and I'm asking --

13          A.    I didn't say we -- I said the way we

14    ran the decision-making, we didn't do it, and

15    there's no record of that.

16          Q.    There's no record of that system?

17          A.    No, staff working over 50 hours a

18    week.

19          Q.    Is there a record of them never

20    working over 50 hours a week?

21          A.    There is record of -- there is no

22    record of them ever working 50 hours a week.

23          Q.    Is there any record to the contrary?

24          A.    There is no record that they ever

25    worked 50 hours a week.

265

1                          Cutler

2              Q.    Is there a record that they worked

3        less than 50 hours a week?

4              A.    I don't know.

5              Q.    And if we review those records, have

6        those such records been produced?

7              A.    I don't know.  You have what you

8        have, so --

9              Q.    If they exist, would they have been

10       produced?

11             A.    Oh, absolutely.

12             Q.    So, if they have not been produced,

13       it's safe to say that they don't exist?

14             A.    I don't know if they looked -- I

15       don't know if they've been able to find it.  If

16       there were records they had worked 50 hours a

17       week, we would have those in our possession.

18             Q.    So, if we don't have them in our

19       possession, they don't exist?

20             A.    That's not necessarily true.

21             Q.    So, they may exist and they have not

22       been produced?

23             A.    I don't know.

24             Q.    If they do exist and they haven't

25       been produced, why would they not be produced?

266

Cutler

1

2          MR. SCHWARTZMAN:  Objection as to

3      form.

4          THE WITNESS:  Because we haven't

5      found them.

6   BY MR. THOMPSON:

7      Q.    And this has been ongoing for three

8   years?

9      A.    Right.

10     Q.    Has there been a diligent search

11  conducted to find these records?

12     A.    Derek and Melinda went above and

13  beyond to find everything they were requested to

14  find.

15     Q.    But they haven't found these records

16  that we're discussing?

17          MR. SCHWARTZMAN:  Objection to the

18      form of the question.

19          THE WITNESS:  About working over 55

20      hours a week?

21  BY MR. THOMPSON:

22     Q.    Working less or more than 50 hours a

23  week.

24     A.    Right.  Let's move on.

25     Q.    Well, I'm trying to get to the bottom

267

1                              Cutler

2        of --

3                        MR. SCHWARTZMAN:  Objection to the

4               form of the question.

5                        THE WITNESS:  No one worked 50 hours

6               a week.

7        BY MR. THOMPSON:

8               Q.    But how do you know that?

9               A.    I know that.

10              Q.    How?

11              A.    I know that.  I feel very comfortable

12       in saying they never worked 50 hours a week.

13              Q.    But as an employer, the company is

14       required to keep a record of how many hours an

15       employee worked.  And you're saying that you know

16       that, and I'm asking how, and you are saying

17       just -- it's fine if it's not a documented record,

18       I'm just asking you how.

19            Is it because you observed it?

20                        MR. SCHWARTZMAN:  Objection as to

21               form.  The question is compounded that it

22               makes more than one assumption.

23                   You may answer if you understand.

24                        THE WITNESS:  I'm sitting here

25               because someone made a complaint that they

268

1                          Cutler
2           worked, where is it?  It didn't happen.
3                That's my answer, it didn't happen.
4      BY MR. THOMPSON:
5           Q.    It didn't happen?
6           A.    Yes.
7           Q.    But there's no record of it not
8      happening?
9                     MR. SCHWARTZMAN:  Objection as to
10               form.
11                    THE WITNESS:  I've answered your
12               question.
13     BY MR. THOMPSON:
14          Q.    So, you're refusing to answer this
15     question?
16          A.    No, I'm not refusing.
17          Q.    Let's talk about employee pay.
18          Are you familiar with the wage laws of
19     United States, are you familiar with federal wage
20     laws?
21                    MR. SCHWARTZMAN:  Objection as to
22               form.
23                    THE WITNESS:  I think I'm familiar.
24     BY MR. THOMPSON:
25          Q.    Were you familiar in 2011 with

273

Cutler

1
2       A.    We changed the whole -- after this,
3    we changed the whole thing, so, yes.
4       Q.    So, prior to the commencement of this
5    lawsuit, did the company ever pay overtime?
6             MR. SCHWARTZMAN:  You asked him that
7          and he answered it.  It's been asked and
8          answered.
9             MR. THOMPSON:  No, it hasn't.
10            MR. SCHWARTZMAN:  It has.
11            MR. THOMPSON:  No, it hasn't.
12   BY MR. THOMPSON:
13      Q.    Prior to the commencement of this
14   lawsuit, did the company ever pay overtime to any
15   employees?
16            MR. SCHWARTZMAN:  Note my objection
17          to the form of the question.
18            THE WITNESS:  What we paid, say the
19          sixth day, they've got an extra day's pay.
20   BY MR. THOMPSON:
21      Q.    And what was an extra day's pay?  How
22   is that calculated?
23      A.    It would be calculated on the same
24   rate as the previous days.
25      Q.    So, you would assume that if they

274

Cutler

1

2      were making a salary, that it was based on five

3      days, and if they worked a sixth day, you would

4      divide the salary by five and add one-fifth, is

5      that how you're doing it?

6           A.    That would be in a different company,

7      that was at a different place.

8           Q.    I don't understand, I'm sorry.

9           A.    Yes, we would just add another day.

10          Q.    Based on the prorated day rate that's

11     based on the salary?

12          A.    Yes.

13          Q.    Are you familiar with the concept of

14     spread of hours payment?

15          A.    I was not.

16          Q.    You are now?

17          A.    I'm now.

18          Q.    Was it ever paid to any employees

19     prior to the commencement of this lawsuit?

20          A.    "Spread hours" meaning extra hours

21     for ten hours work?

22          Q.    Correct.

23          A.    I was not, no.

24          Q.    Who decided what employees would make

25     what amount in terms of their salary?  Obviously,